KINGS COUNTY LIGHTING COMPANY, Plaintiff, *v.* MERTON
E. LEWIS, as Attorney-General of the State of New
York, OSCAR S. STRAUS, HENRY W. HODGE, WILLIAM
HAYWARD, TRAVIS H. WHITNEY and CHARLES S.
HERVEY, Composing the Public Service Commission
for the First District of the State of New York, and
THE CITY OF NEW YORK, Defendants.

(Supreme Court, New York Special Term, January, 1920.)

Constitutional law — Laws of 1916, chap. 604 — gas companies —
when statutory rates not shown to be confiscatory — evidence.

Where a statute (Laws of 1916, chap. 604) fixes the price
at which plaintiff, a gas company, may sell gas in the territory
served by it, the plaintiff in an action to have the statute
declared unconstitutional as to it on the ground that its en-
forcement would be confiscatory of plaintiff's property without
due process of law, has the burden of establishing confiscation
beyond a reasonable doubt.

The fact that it appears that during an abnormal period
there was no adequate return upon the capital of plaintiff is
an insufficient ground for declaring the statute unconstitu-
tional, and plaintiff's failure to make a trial of the prescribed
rate justifies a dismissal of the complaint, particularly as it
appears that plaintiff continuously during a year's operations
failed to furnish gas of a twenty-two candle power, the
standard prescribed by the statute.

Complaint dismissed, with costs, but without prejudice to a
reopening of the case, if plaintiff, after an adequate experi-
mentation under the statutory rate, believes that it can
establish that as to it the statutory rate is confiscatory.

ACTION to have chapter 604, Laws of 1916, adjudged
unconstitutional.

Ingraham, Sheehan & Moran (Samuel F. Moran, of
counsel), for plaintiff.

Robert S. Conklin, for attorney-general.

Godfrey Goldmark (Oliver C. Semple, of counsel), for public service commission for first district.

William P. Burr, corporation counsel (John P. O'Brien, Joseph P. Morrissey and A. Judson Hyatt, of counsel), for defendant city of New York.

GREENBAUM, J.   This action is brought by the plaintiff to have declared null and void as to it chapter 604 of the Laws of 1916, effective July 1, 1916, which fixed the price of gas sold to the public in the territory served by the plaintiff at eighty cents per 1,000 cubic feet, upon the alleged ground that the enforcement of the statute would be confiscatory of the plaintiff's property and violative of the Constitution of the United States (art. 1, § 10, cl. 1), and the Fourteenth Amendment thereto and of the Constitution of the state of New York (art. 1, §§ 6 and 7).

Before entering into a consideration of the questions involved in this case it may prove of some value for future trials of similar actions briefly to state the experience of the court upon the trial of this action.

The defendants' expert accountants had not made such an examination before trial of the plaintiff's records, papers, documents and vouchers as would have enabled them to verify the correctness of the entries in numerous books bearing upon the cost of its plant and the expenses of operation.   The city's counsel being thus uninformed as to the accuracy of the plaintiff's books and as to the methods in vogue in plaintiff's business of posting entries from original memoranda, insisted upon strict proof of the correctness of its book entries.   A vast amount of time was consumed in the plaintiff's efforts to establish the cost of its plant and operations and in prolonged and tedious cross-examinations of its wit-

nesses. In the interest of economy of time the court permitted the defendants' experts to examine the plaintiff's books and papers pending the trial, and for that purpose adjourned the hearings from time to time and took up the trial of other actions.

There seems to be no substantial reason why, in a rate case, which necessarily involves a critical examination of the books and vouchers of a public utility company, the experts of the defendants, who represent the public interests, should not be afforded full opportunity as a matter of course to make a thorough examination of its books and documents before trial and thereby obviate a ruthless waste of the time of the court.

As a consequence of the conditions under which the trial was had eighty-three court days were consumed in the presentation of proofs and 10,000 type-written pages of testimony were taken, embraced in twelve volumes.

The court is convinced that with an adequate preparation on the part of all the parties the trial could have been completed within four or five weeks.

The plaintiff is the immediate successor of the Kings County Gas and Illuminating Company, a corporation which came into existence in 1889. The evidence justifies the conclusion that the formation of that company was prompted by the circumstance that on December 26, 1889, its promoters had secured from the former town of New Utrecht, now the thirtieth ward of the borough of Brooklyn, in which the plaintiff operates, a ten-year lighting contract to commence September 2, 1891. Under this contract it became entitled to receive twenty-eight dollars per annum for each lamp on the highways lighted by it and to supply gas to public buildings and private consumers at a sum not to exceed two dollars and twenty-five cents

per 1,000 cubic feet. The contract was subsequently extended on March 19, 1891, for a further period of fifteen years. The new contract differed from the first in providing for a reduction of the rate for public buildings and private consumers to a sum not exceeding one dollar and seventy-five cents per 1,000 cubic feet.

Upon its incorporation the illuminating company, as it will be called hereafter for the sake of brevity, issued capital stock to the amount of $1,000,000 and at the same time put forth an issue of five per cent bonds in the amount of $750,000 to be secured by its first mortgage. So far as the proofs show, this company began business with practically no cash in its treasury.

The town of New Utrecht was annexed to the city of New York in 1894 by virtue of chapter 451, Laws of 1894. Upon such annexation the company became subject to the provisions of section 70, chapter 566 of the Laws of 1890, which fixed one dollar and twenty-five cents per 1,000 cubic feet as the maximum rate for gas sold to the public in cities of the first class. By chapter 125 of the Laws of 1906, the legislature enacted that on and after May 1, 1906, the charge for gas in the thirtieth ward of Brooklyn should not exceed one dollar per 1,000 cubic feet. That act was amended by chapter 604 of the Laws of 1916, which fixed the maximum rate on and after July 1, 1916, for the boroughs of Manhattan and Brooklyn at eighty cents per 1,000 cubic feet.

It appears from the minute books of the illuminating company, which were produced by the plaintiff and introduced in evidence by the defendants, that when that company was organized one George E. Bartlett, who was a contractor and builder, owned the land at Sixty-fifth street and Ninth avenue in the town

of New Utrecht, where the present gas holders of the plaintiff company. are located. This land he sold to the illuminating company in consideration of the transfer to him of the company's bonds in the amount of $20,000 and of its stock in the like amount. It also appears from the minutes that four separate contracts were successively entered into between Bartlett and the company for construction work and for the furnishing of mains, materials and various kinds of apparatus to be used in its gas business, all of which were to be paid for by bonds and stock of the company. Upon the completion of these contracts Bartlett became the owner of all of the capital stock of the company saving a few shares and of its bonds to the amount of about $550,000. It thus appears that all of the assets came from Bartlett, who became the virtual owner of the company.

The illuminating company commenced to supply gas on September 2, 1891, the date when its first street lamp was lighted. At that time and up to 1900 the company manufactured no gas, but purchased it at the rate of sixty-five cents per 1,000 cubic feet from other companies. In 1890 a 100,000-foot gas holder was erected on the Sixty-fifth street plot, and in 1892 a 500,000-foot holder was built on the same plot. In 1895 the company acquired a large block of land where the present manufacturing plant is located, situated between Fifty-fourth and Fifty-fifth streets, one side of which fronted on First avenue and the opposite side on New York bay, for the consideration of $119,-500, of which $35,500 was paid in cash and the balance of $84,000 by the execution of a purchase-money mortgage for that amount.

On July 1, 1904, the plaintiff, through merger proceedings, succeeded to the ownership of the assets of the illuminating company and assumed all of its lia-

bilities. Before and at the time of the merger, the stock of plaintiff's predecessor company was almost entirely in the hands or under the control of Messrs. C. K. J. Billings, Anthony N. Brady and Hugh J. Grant, who, after the merger, became the voting trustees of the plaintiff company. It is thus evident that in 1904 the interests which then controlled the illuminating company also controlled the plaintiff upon and subsequent to its incorporation. The method for accomplishing the merger, briefly stated, was that one Ward, a stockholder of the illuminating company, offered to sell all of its capital stock to the plaintiff company in consideration of the transfer of its entire capital stock, which was to be fixed at $2,000,000, and of an issue of first mortgage bonds to be executed in the amount of $1,112,500. The offer was accepted. The effect of this formal transaction was an immediate increase of the capital stock to $2,000,000 and of its bonded indebtedness by the sum of $1,112,500.

The plaintiff company opened its books as of July 1, 1904, with entries showing the issue of $2,000,000 of shares of stock in place of the $1,000,000 of shares of stock of the predecessor company and an increased bonded indebtedness of $1,112,500, making an aggregate corresponding increase of upwards of $2,112,500 in the amount of permanent investment of the new company over that appearing in the books of the illuminating company on June 30, 1904.

There was not the slightest evidence adduced which would show any warrant for this increased capitalization and the increased bonded indebtedness. In fact the transaction was clearly an arbitrary new book value of the properties through the medium of a new corporation apparently organized for that express purpose.

The plaintiff contends that the present reproduc-

tion cost forms the proper basis of valuation of its plant. The defendant the City of New York insists that the actual original cost of its properties must control. The defendant Public Service Commission claims that the value should be reached upon the consideration of all the relevant facts. The rule now seemingly recognized by the courts is that the fair present value of the property is the basis upon which a fair return should be paid. *Smyth* v. *Ames,* 169 U. S. 466, 546; *San Diego Land & Town Co.* v. *National City,* 174 id. 739, 757; *Willcox* v. *Consolidated Gas Co.,* 212 id. 19; *Simpson* v. *Shepard,* 230 id. 352, 434; *People ex rel. Kings County Lighting Co.* v. *Willcox,* 210 N. Y. 479, 485. In other words, the just or fair compensation to which a public utility is entitled must be based upon " a fair return upon the reasonable value of the property at the time it is being used for the public." *San Diego Case, supra.*

As to the method of arriving at the present value of the property there is no hard and fast rule. " The ascertainment of the value is not controlled by artificial rules. It is not a matter of formulas, but there must be a reasonable judgment having its basis in a proper consideration of all relevant facts." *Minnesota Rate Cases,* 230 U. S. 352, 434.

In *People ex rel. Kings County Lighting Co.* v. *Willcox,* 210 N. Y. 490, 492, the court's opinion by Miller, J., is: "A public service corporation is entitled to a fair rate of return from the beginning of its investment and no more. If the shareholders have been deprived of a fair return on their investment because of the time and expense reasonably and properly required to build up the business, they have, to the extent of that deprivation, added to their original investment and are entitled to a return upon it.

\* \* \* The fair return is to be computed on the actual investment, not on an over issue of securities.''

In *Smyth* v. *Ames,* 169 U. S. 466, 544, the court said: '' If a railroad corporation has bonded its property for an amount that exceeds its fair value, or if its capitalization is largely fictitious, it may not impose upon the public the burden of such increased rates as may be required for the purpose of realizing profits upon such excessive valuation or fictitious capitalization \* \* \*.''

Under the authorities the original cost of construction is a relevant fact to be considered in arriving at its present value. In this connection, however, it is instructive to consider the statutes on this subject. The amendment of the Public Service Commissions Law (Laws of 1912, chap. 289) added two new sections to the law, section 55-a as to common carriers and section 69-a as to gas companies, and provided that the reorganizations of such corporations under sections 9 and 10 of the Stock Corporation Law should be subject to the control of the public service commission, and further, that: '' 2. Upon all such reorganizations the amount of capitalization, including therein all stocks and bonds and other evidence of indebtedness, shall be such as is authorized by the commission, which, in making its determination (sic), shall not exceed the fair value of the property involved, taking into consideration its original cost of construction, duplication cost, present condition, earning power at reasonable rates and all other relevant matters and any additional sum or sums as shall be actually paid in cash, provided, however, that the commission may make due allowance for discount of bonds \* \* \*.''

The amendment of 1910 of the Public Service Commissions Law, applicable alike to common carriers and gas and electrical companies, conferred the power

upon the commissions to fix maximum rates, having due regard, among other things, to a reasonable average return "upon capital actually expended" and to the necessity for making reservations out of income for surplus and contingencies. This amendment repealed section 38 of the Railroad Law and was transferred to the railroad section of the Public Service Commissions Law (§ 49, subd. 1), and was also incorporated in the gas and electric section (§ 72).

In chapter 672, section 97, Laws of 1910, a further amendment was made authorizing the regulation of telegraph and telephone companies, in which it was provided that " the commission shall with due regard, among other things, to a reasonable average return upon the value of the property actually used in the public service and of the necessity of making reservation out of income for surplus and contingencies, determine the just and reasonable rates," etc.

It is to be observed that in the case of those public service corporations there is no mention of the " capital actually expended."

In 1911, by chapter 546, the legislature further amended section 49 of the Public Service Commissions Law, as to common carriers, by striking out the words " upon capital actually expended " and inserting in place thereof " upon the value of the property actually used in the public service." The statute applicable to gas companies, however, does not appear to have been amended since 1910, and hence that statute still remains as amended in 1910, namely: "A reasonable average return upon the capital actually expended." The policy of the state with reference to gas companies has thus been and still appears to be that the money actually expended by investors for construction purposes shall form the basis of measuring their fair return. The court has, nevertheless,

proceeded to appraise the value of the plaintiff's prop-
erties upon what it has deemed from all the evidence
to be the present value of the plant, in view of the rule
now generally recognized by the courts.

The unsatisfactory character of so-called expert
opinion on the valuation of a hypothetically repro-
duced plant at a given time must be apparent to every
one who has had experience with that kind of testi-
mony. Thus in *City of Knoxville* v. *Knoxville Water
Co.*, 212 U. S. 1, 18, the court referred to " * * * that
most unsatisfactory evidence, the testimony of expert
witnesses employed by the parties." The court has
therefore taken into consideration in determining the
present value of the plaintiff's business both the orig-
inal and estimated reproduction cost of construction.
In order to satisfy itself as to such cost it has taken
into account the increase and decrease in value of
materials and labor since the time that the various
items of property were acquired; the changes, if any,
in the methods, machinery and apparatus in gas manu-
facture since the time when the machinery and equip-
ment were purchased; the deterioration of the prop-
erties and their general condition at the present time
and such other relevant facts as have been established
during the course of the trial, including such items as
contractors' profits, engineering expenses, cost of
permanent organization, interest and preliminary and
development expenses.

As to the element of what has been termed " going
value," however, it is primarily to be observed that
although an attempt was made by the plaintiff to elicit
an opinion thereon from Mr. Alton S. Miller, the
plaintiff's expert, he was not permitted to testify in
respect thereto for the reason that it became evident
after an exhaustive preliminary examination of the

witness upon that point that he was not prepared to give estimates on " going value " based upon the meaning of " going value " as those words are understood and interpreted by the courts, as shown by the cases presently to be cited. The witness repeatedly stated that he relied in forming his estimate not on the actual cost of developing the business, but on a hypothetical cost of reproducing it. Moreover, it appeared that this witness had not acquired such an experience as would enable him to qualify as an expert in that regard, nor did he show that he had any knowledge of the actual experiences of the plaintiff company or of other companies as bearing on the question of " going value." No other attempt was made by the plaintiff to introduce evidence of " going value " and, indeed, its counsel formally stated upon the trial that he would abandon the claim for " going value " because of the amount of time that would be consumed if proof were taken to establish the early losses of the company.

Notwithstanding, however, that the court had understood that plaintiff's counsel had abandoned the item of " going value " in estimating the capital of plaintiff, it subsequently developed that he desired to reserve exceptions to the court's ruling as to the competency of the witness Miller in that regard. The court therefore deems it proper to refer to the leading cases which hold that " going value " is based upon the actual experience of a public utility.

In *Des Moines Gas Co.* v. *City of Des Moines,* 238 U. S. 153, 165, the court said: " Included in going value as usually reckoned is the investment necessary to organizing and establishing the business which is not embraced in the value of its actual physical property. In this case, what may be called the inception cost of the enterprise entering into the establishing of a going

concern had long since been incurred. The present company and its predecessors had long carried on business in the City of Des Moines, under other ordinances, and at higher rates than the ordinance in question established. For aught that appears in this record, these expenses may have been already compensated in rates charged and collected under former ordinances. As we have said, every presumption is in favor of the legitimate exercise of the rate-making power, and it is not to be presumed, without proof, that a Company is under the necessity of making up losses and expenditures incidental to the experimental stage of its business.''

In *People ex rel. Kings County Lighting Co.* v. *Willcox,* 210 N. Y. 479, the court recognized that '' going value '' was primarily determinable from the actual experience of the company. The record in the case before it evidently justified the conclusion of the court that there were no records of the company available that would show the actual experience of the company and that no oral evidence on that score was available and that as matter of fact the company had not been compensated for its '' going value.'' Under such circumstances the court held that expert testimony as to '' going value '' was permissible.

The proofs upon this trial, however, established that the plaintiff proffered no proof that the records were not procurable, and it affirmatively appeared that there were living witnesses who presumably were familiar with the early history of the company, some of them still connected with it, who were not called to state what knowledge they possessed of the facts bearing upon the question of '' going value.'' Besides, as will be presently shown, there is every reason to conclude that the plaintiff has been fully compensated for expenses involved in '' going value.'' Although the

court was not called upon to pass upon that question, it would seem that upon the proofs before the court expert opinion testimony of " going value " was not admissible.

It has already been shown that the capital stock of $1,000,000 of the Kings County Gas and Illuminating Company, the predecessor of the plaintiff, did not represent the investment of any moneys or a fair equivalent thereof. The only asset which that company had was a contract for lighting the public streets of the former town of New Utrecht. When the plaintiff company began its career it acquired all of the assets and assumed all of the obligations of its predecessor company, but nothing of value was added to the assets of the plaintiff. It nevertheless increased the capital stock by $1,000,000 and created a bonded indebtedness of $1,112,500, with interest obligations thereon of five per cent per annum, which have been regularly paid up to the present time.

In studying the net income of the plaintiff's business during the years of its existence as distinguished from its net earnings, it should be borne in mind that in 1904, when the plaintiff was incorporated, the value of its then assets was slightly in excess of its indebtedness, which aggregated $915,000, made up of the bonded indebtedness of $831,000 and the outstanding mortgage of $84,000 on the Fifty-fourth street property. In other words, for all practical purposes it would be safe to say that the assets of the company did not exceed $1,000,000, and that sum may be fairly taken as the rate base for 1904.

When plaintiff started in business practically its entire book capital was represented by its then outstanding bonded and real estate indebtedness. So much of its income which was thereafter periodically applied to the payment of interest on this indebted-

ness was in fact taken from its net earnings, the remaining portion thereof being applicable to the payment of dividends on stock, for which very little or nothing has been paid by the original stockholders.

Bearing in mind the foregoing observations, it will be appropriate to tabulate the yearly net earnings as disclosed by the books of the company.

The plaintiff's books show that the net earnings for the first six months of its existence ending December 31, 1904, were upwards of $20,000; on December 31, 1905, the net earnings for that year were $45,212.80; on December 31, 1906, $67,485.23; on December 31, 1907, $88,821.36, out of which dividends were declared to the extent of $40,000, being at the rate of two per cent on $2,000,000 of capital stock.

The net earnings for 1908 were $106,656.34, out of which dividends to the amount of $90,000 were paid, being four and one-half per cent on $2,000,000. For 1909 the net earnings were $128,025.17, from which dividends were paid amounting to $120,000, being six per cent on $2,000,000. The net earnings and dividends for the succeeding years were as follows:

| Year. | Net earnings. | Dividends. |
|---|---|---|
| 1910 | $159,389 86 | $120,000 |
| 1911 | 142,215 07 | 120,000 |
| 1912 | 167,934 42 | 120,000 |
| 1913 | 117,004 39 | 115,000 |
| 1914 | 131,975 86 | 125,000 |
| 1915 | 100,852 18 | 120,000 |
| 1916 | 45,233 87 | 20,000 |
| 1917 | 60,900 03 | ........ |
| 1918 | 3,000 00 | ........ |

It is thus clearly established that since the inception of the plaintiff it has realized a substantial income

and has been fully compensated for the expenses incurred in developing its business and that it would therefore not be entitled now to add anything for " going value."

The plaintiff's proofs of the present value of its plant rest upon the expert testimony of Mr. Miller. This witness prepared an itemized inventory of the plaintiff's equipment and gave his estimates of their value both upon pre-war prices, *i. e.,* in 1913–1914 and upon war-time prices in 1917.

Many of the figures given by the witness were derived from sources that were purely hearsay. As to many items he did not show familiarity with prevailing rates of wages and materials. With respect to such a large item as meters, the witness relied upon assumptions as to their condition without an examination of them. His pre-war revised estimate (1914) of the cost of plant reproduction, omitting the land and without the additional items of contractors' profits, engineering, permanent organization or preliminary and development expenses was $2,321,148, being $2,428,134 less $107,036 for deductions due to elimination of concrete wharf and corrected meter costs. His estimate of the additional items just mentioned, including taxes on land and interest on capital dormant during construction was $941,344, making his total estimate of the value of the plant excluding the land $3,262,492.

These additional items, exclusive of interest and taxes, aggregate $616,194, and consist of contractors' profit of ten per cent on subcontractors' charges for construction, amounting to $207,349; five per cent for engineering expenses, amounting to $131,777; two and one-half per cent for expenses of permanent organization pending construction, amounting to $69,183,

and preliminary and development expenses of $207,885, estimated on a five per cent basis.

It may be observed that Miller allows nothing for depreciation, because, as he states, that is an element which is non-existent as long as the plant is maintained in good condition, and the evidence shows that it is a well-maintained plant.

As to the inventory of the same witness based upon prices prevailing in January, 1917, a war period, the court is of opinion that a valuation during such abnormal times is wholly untenable. The then existing abnormal conditions were such as to make it absolutely unfair to consider the prices then prevailing as the basis of valuation. Indeed, the witness himself admitted that he did not think that the plant could in fact be reproduced under any circumstances whatever at any price during 1917.

As was stated by former United States Supreme Court Justice Hughes, sitting as referee in *Brooklyn Borough Gas Co.* v. *Public Service Commission,* 17 State Dept. Rep. 81, 98, 99: " To base rates upon a plant valuation simply representing a hypothetical cost of reproduction at a time of abnormally high prices due to exceptional conditions would be manifestly unfair to the public."

The valuation of plaintiff's plant, omitting land, as given by Alton D. Adams, the expert witness called in behalf of the city of New York, was based upon his estimated original cost of the plaintiff's plant. This witness analyzed the cost by dividing the plant into two parts, to wit, the portion acquired between 1890 and 1904, the period of operation of the plaintiff's predecessor company, and the remainder, installed during plaintiff's regime from 1904 to 1917.

The sources upon which this witness relied for ascertaining the cost during the latter period were

the books and records of the plaintiff. For the earlier period he had recourse to certain documents, memoranda, reports and public records, which emanated from the former company's officials. Among them is a so-called black book, which was a record of the works kept by a superintendent, a Mr. Byrne, since deceased; a machinery book, which furnished the dates when the buildings and equipment were installed, and a book which contains records of service pipes and connections laid. The regular books of account of the former company were not produced.

Mr. Adams' valuation is based upon the same items of equipment so far as subject-matter and quantities are concerned as those enumerated in Miller's inventory. According to Mr. Adams' figures, the original cost of the plant as of December, 1917, was $2,299,307, of which $862,298 represented the cost of the plant acquired during 1890–1903 and the balance of $1,437,-009 the cost of the plant installed during 1904–1917. This witness estimated the depreciation of the plant acquired during the earlier period at $213,560 and of the remainder at $148,168, making a total depreciation of $361,728. His estimate of the actual cost of construction, less depreciation, is thus $1,937,579.

On October 20, 1911, the public service commission for the first district made an order fixing the maximum price of gas at eighty-five cents per 1,000 cubic feet between November 1 and December 31, 1912, and at eighty cents per 1,000 cubic feet thereafter to December 31, 1913. The order of the public service commission was annulled by the Appellate Division in certiorari proceedings and the matter remitted for rehearing. *People ex rel. Kings County Lighting Co.* v. *Willcox,* 156 App. Div. 603; affd., 210 N. Y. 479.

In these proceedings the commission's valuation of plaintiff's properties and working capital as of Decem-

ber, 1910, detailed in the opinion in the Appellate Division, *supra,* at page 608, was $2,477,579, including the land. Deducting the land value, fixed at $650,000, and working capital of $80,000, we obtain the sum of $1,747,579 as the reproduction cost of the plant, omitting the land. Adding thereto the sum of $757,-508.82, the amount of net additions to the capital from January 1, 1911, to December 31, 1916, as taken from the books of the company, we obtain a reproduction cost as of December 31, 1916, of $2,505,087. These figures included contractors' profits, engineering, administration, preliminary and development expenses and incidentals.

An analysis of cost of the properties as taken from the records of the predecessor illuminating company and from its income tax reports up to June 30, 1901, shows that the book cost of the real estate and improvements, including equipment, was $1,831,000 which coincides with the figure obtained if the capital stock of $1,000,000 be added to the amount of the bonds issued by the company up to that date, to wit, first mortgage bonds amounting to $581,000 and debenture bonds amounting to $250,000. On that date the total secured funded debt of the company was $915,000, made up of the above-mentioned first mortgage and debenture bonds amounting to $831,000, plus the sum of $84,000, the amount of the outstanding real estate mortgage on its Fifty-fifth street property, heretofore mentioned.

A statement made by the company to the department of taxes and assessments, as of September, 1901, verified December 10, 1901, reveals that the cost of its plant, exclusive of real estate, was $774,539.

It also appears from the minutes of the former company that the actual cost of the land at Fifty-fifth street was $119,500, and that the cost of the land at

Sixty-fifth street was $20,000, paid for in bonds of that amount, making the total cost of the land $139,500, which, added to $774,539, gives us the figure of $914,-039, to which should be added some minor items of floating capital amounting to less than $1,000, or a grand total cost of plant, real estate and minor expenditures of $915,039, the figure which reflects the aggregate of the amount of debenture bonds of the company outstanding at the time of $831,000, plus the mortgage debt of $84,000 on the Fifty-fifth street land.

It is thus demonstrated beyond the slightest doubt that, saving a few shares, the entire issue of stock of the company, amounting to $1,000,000, turned over to Bartlett from time to time coincidentally with the delivery of the bonds of the company, was a mere bonus, and that the book value of $1,915,000 was in reality an exaggeration of the then actual value of all of the property of the illuminating company to the extent of $1,000,000.

In the absence of the books of the company, it is impossible to ascertain with accuracy the items of increase in the capital between June 30, 1901, and June 30, 1904, when the merger took place. It appears, however, from the records in evidence that on the latter date the book cost of the company's real estate, improvements and equipment was $2,441,997, indicating additions to the amount of $610,997 during that period, although the tax reports for the years ending June 30, 1902, and June 30, 1903, merely show new construction for these annual periods amounting in the aggregate to $253,385.71.

On July 1, 1904, the plaintiff opened its books with a stated permanent investment of $4,484,936.37. But that figure obviously included the sum of $3,112,500 heretofore discussed, made up of $2,000,000, the amount of its capital stock, plus the sum of $1,112,500,

the amount of the bonds created at the time of the merger, both of which represented water and nothing of value entering into the cost of the plant or land. Deducting $3,112,500 from $4,484,936.37 we have $1,372,436.37, the apparent actual capital on July 1, 1904.

On December 31, 1916, the books of the plaintiff showed permanent investment as $5,889,301.18. Deducting from $5,889,301.18 the aforementioned sum of $3,112,500 we obtain the sum of $2,776,801.18 as the value of the fixed capital on December 31, 1916, assuming as correct all the items of costs of the plant and additions thereto as entered in the records of the former company and in the books and records of the plaintiff.

Comparing now the results of the expert appraisals with the revised book costs of the plaintiff and the valuation of the public service commission, we reach the following results:

1. Mr. Miller's pre-war reconstruction value ............................ $3,262,492
2. Mr. Adams' appraisal of original cost, deducting depreciation and including engineering expenses, taxes and interest .......................... 1,937,579
3. Public service commission's valuation in the certiorari proceeding brought down to December 31, 1916 ............................. 2,505,087
4. Book cost, deducting capital stock of $2,000,000 and increased bonded indebtedness of $1,112,500.......... 2,776,801

The plaintiff's expert, Miller, testified that values had not materially changed between 1904 and 1914,

the pre-war date upon which he based his estimate.
He indeed stated that the cost of steel had declined
since 1904. It was not claimed that labor had mate-
rially increased from 1904 to 1914. His inventory of
subcontractors' costs of construction, after making the
deductions due to the elimination of the concrete
wharf and corrected meter prices, was $2,321,148. His
estimates of preliminary and development expenses,
engineering costs and costs of permanent organiza-
tion are more or less arbitrary, particularly when one
considers that the laying of mains and services and
the installation of meters are ordinarily to a very
large extent done by the regular employees of a gas
company under an established organization, which
manages its business generally. Why should an engi-
neer be paid five per cent on every gas meter pur-
chased and for every main laid?

Besides, Mr. Miller makes no allowance for depre-
ciation. He claims that a plant adequately maintained
accomplishes all that a new plant would accomplish,
and hence that it is as good as new. Mr. Adams
strongly controverts this view, and contends that
depreciation begins to an inappreciable extent from
the time it is installed, and that depreciation is a con-
tinuing factor, the percentage thereof varying largely
in different items of the plant. It is, for instance, con-
ceded that cast-iron gas pipes have a very long life,
but nevertheless many of these pipes will in the course
of time be injured by extraneous causes, and many of
them will become unusable and worthless because of
changing conditions in the neighborhood. It would,
however, be futile for the court to attempt to pass
judgment upon the merits of a controversy as to
which reputable engineers appear to differ. It doubt-
less is a matter of considerable speculation to say to
what extent a piece of machinery or other construc-

tion has depreciated. The courts, nevertheless, have generally recognized the propriety of taking into account the element of depreciation, and the same course has been quite uniformly recognized as proper by public service bodies. *City of Knoxville* v. *Knoxville Water Co.,* 212 U. S. 1; *Ann Arbor R. Co.* v. *Fellows,* 236 Fed. Repr. 387; *Denver* v. *Denver Union Water Co.,* 246 U. S. 178; *Brooklyn Borough Gas Co.* v. *Public Service Comm.,* 17 State Dept. Rep. 81.

It must, however, always be borne in mind that in rate cases the burden is upon the plaintiff to establish confiscation beyond reasonable doubt. On the question of original cost, prior to 1904, the plaintiff has deliberately refrained from calling witnesses who are still alive, and some of whom are still connected with it, who could have testified whether the books of the predecessor company to which it succeeded were not accessible and who even in the absence of such books might have thrown a flood of light upon the matters involving the original cost of construction. The court is justified in applying the rule that the failure of the plaintiff to call these witnesses justifies the conclusion that their testimony would have been unfavorable to it.

The city's expert's estimate of depreciation during 1890 to 1917 is $461,728 upon his valuation of the plant, excluding the land, of $2,299,307. This would represent a depreciation of about fifteen per cent during seventeen years.

Considering all the various sources from which one is enabled to derive information as to the fair reproduction cost of the plaintiff's plant, omitting the land, which presently will be considered, the court is of opinion that its value as of December, 1916, will be fairly measured by the sum of $2,350,000, which is close to the estimate given by Mr. Adams as original cost without depreciation.

15

As to the land owned by the plaintiff, it has been heretofore stated that it consists of two distinct parcels. The larger and more valuable one is located between Fifty-fourth and Fifty-fifth streets and First avenue and New York bay. Its area is 462,208 square feet. A portion of it, consisting of 111,280 square feet, is under water, and the balance, comprising 64,474 square feet, is upland. A considerable portion of this land is occupied by the Morse Dry Dock and Repair Company under a lease from plaintiff for a term of years commencing September 1, 1917. The remainder of this plot is used in plaintiff's business.

The plaintiff's expert witness values the whole plot at $927,448, upon the basis of an average of $2 per square foot over all. He values the portion leased to the Morse Company at $268,137, and the remainder at $659,310.

The public service commission's witness placed a value of $1.30 a square foot over all. He values the entire piece at $603,972.60, the portion used by the Morse Company at $179,713.60, and the remainder at $424,259.

The city's witness values a square foot over all at $1.14, and on that basis fixes the value of the entire plot at $527,042.63, the leased portion at $187,851 and the remaining portion at $339,191.13.

It appears that plaintiff's witness had never effected any sales of any water-front property. During the preceding ten or fifteen years there was practically no activity in the sale of real estate in the vicinity where the property is located. Plaintiff's witness seemed to base his views of value largely upon the Morse lease, which he negotiated in 1917, and another lease at Fifty-seventh and Fifty-eighth streets made in 1916. He admits that both of these leases were for war uses. These leases clearly would not be fair criteria of pre-

war values. The valuations of the witness are not reflected by any experience which he had and are largely speculative. The court is disposed to accept the valuation of the commission's expert, to wit, $424,259.

The other parcel of land is at Sixty-fifth street and Ninth avenue. A portion thereof is not used by the plaintiff. The court is of the opinion that $55,000 would be a fair valuation of the part used by plaintiff. The court finds that the sum of $479,259 represents a fair valuation of all the lands used in plaintiff's business.

As to what would be an adequate allowance for working capital, the parties differ materially. It should doubtless be an amount sufficient to enable the plaintiff to pay its operating expenses such as wages, materials and supplies purchased on short credit, in advance of the collection of its outstanding accounts. The proofs show that there are outstanding at all times uncollected bills due from customers, which cover a period of from six to eight weeks and that the city's delay in paying its gas bills covers a much longer period. It seems to the court that the estimates submitted by the learned counsel for the public service commission are ample for plaintiff's requirements. These are, for 1916, $212,000; 1917, $228,000; 1918, $244,000. Adding the reproduction cost of the plant at $2,350,000, the value of the land at $479,259 and the working capital at $212,000, we have a total of $3,041,-259, which represents the value of the capital employed by plaintiff in its business on December 31, 1916, and should be taken as the rate base as of that date.

This action was commenced before the legislative act here assailed went into effect and was not brought on for trial until the latter part of 1918. If the court had before it only the experiences of the plaintiff

during 1916 and a few years prior thereto, showing as they do substantial incomes annually, it would have been justified in dismissing the bill upon the evidence, for the reason that the plaintiff had made no practical test by actual operation under the eighty-cent rate. *City of Knoxville* v. *Knoxville Water Co.,* 212 U. S. 1, 14, 15; *Willcox* v. *Consolidated Gas Co.,* Id. 19, 42; *Municipal Gas Co.* v. *Public Service Comm.,* 225 N. Y. 89. As matter of fact the plaintiff has been collecting from its customers since the commencement of this action at the rate of ninety-five cents per 1,000 cubic feet of gas, pursuant to an order of the court, the excess of fifteen cents above the legal rate having been deposited with a trust company pursuant to such order.

The court, however, took proof as to expense of operations, subsequent to July 1, 1916, and down to December 31, 1918, to afford the plaintiff an opportunity to establish that at an eighty-cent rate, confiscation would ensue, despite an economical and efficient operation of the works and a largely increased income because of a lower rate. *Willcox* v. *Consolidated Gas Co., supra,* 42.

It is obvious, unless the evidence is conclusive that confiscation is inevitable under the present law, that it would be mere speculation in the absence of an actual experimentation to find whether the increased business would or would not sufficiently overcome the reduction in price. Under such circumstances the plaintiff would not meet the burden that rests upon it. *Willcox* v. *Consolidated Gas Co.,* 212 U. S. 19.

It thus becomes important carefully to scrutinize the proofs touching the costs of operation for the years 1916 to 1918 inclusive. The annual sales of gas during these years at a ninety-five-cent rate to the public and the seventy-five-cent rate fixed for municipal lighting were as follows:

| 1914 | $874,213 86 |
| 1915 | 890,213 86 |
| 1916 | 950,653 13 |
| 1917 | 1,104,034 75 |
| 1918 | 1,160,552 00 |

It thus appears that even at a ninety-five-cent rate there has been a steady increase in business from year to year. The eighty-cent rate went into effect on July 1, 1916.

The operating revenues, based upon the amount of the gas sold during 1916, calculated at the statutory rate of eighty cents for the latter half of the year, shows a total revenue of $884,721.06 or a decrease in the revenues for that year at a ninety-five-cent rate by the amount of $65,642.07.

The operating expenses for that year, according to plaintiff, were $730,843.05, which if correct would have produced an income to plaintiff at an eighty-cent rate of $153,878.01, or a little over five per cent upon the rate base of $3,041,259.

Included in these operating expenses, however, are legal expenses amounting to $16,653.24 incurred in prosecuting this action and the increased taxes upon the increased revenues at the ninety-five-cent rate collected during the pendency of this action. The reduction in taxes upon an eighty-cent rate would have amounted to $1,129.12. It is conceded by the plaintiff that these two items are properly deductible from the operating expenses. Embraced in the operating expenses is an item of " amortization " for depreciation for 1916, calculated on the basis of eight cents per 1,000 feet of gas sold from January to June and on the basis of eleven and one-half cents per 1,000 feet sold from June to December. The increased figure of eleven and one-half cents for depreciation is wholly

unwarranted in view of the company's experience in that regard in the past and in view of the fact that only eight cents was charged off for depreciation for the first half of the year. The excess amortization calculated at eleven and one-half cents over what it would have been at eight cents for 1916 amounts to $19,410.13. The three items just mentioned aggregate $37,192.49. There is also included in operating expenses the sum of $7,500 paid to one Byrne, a retired superintendent of the plaintiff company, since deceased, who rendered no services during 1916. The impropriety of including that item in a rate case seems to be clear. It was not shown that this payment was justified by any prior agreement made with Mr. Byrne. Upon the evidence the payment of that sum was a mere gratuity.

It is commendable to recognize the faithful services of an old employee. Had it been shown that the plaintiff had adopted a policy years before to encourage faithful and efficient service by providing a pension fund for old age or other disability from which employees would be paid, the moneys set apart for that purpose could have been spread over many previous years and need not have been charged against the years when disability existed.

There is also another item, the propriety of which is challenged by the defendants. It has reference to the price paid for gas oil during the year 1916. As previously stated, the plaintiff's plant is known as a water-gas plant as distinguished from a coal-gas plant. By far the largest single item which enters into the production of water-gas is water-gas oil. In order to form an idea of the extent to which this ingredient enters into the plaintiff's manufacture of gas it will be instructive to refer to the total production expenses of the plaintiff (exclusive of overhead charges, trans-

mission and distribution expenses) for the years 1909 to 1918 and the cost of gas oil for each of these years.

| Year. | Production expenses limited as above. | Cost of gas oil. |
|-------|---------------------------------------|------------------|
| 1909  | $157,255 67                           | $67,283 49       |
| 1910  | 162,084 55                            | 70,136 82        |
| 1911  | 177,670 49                            | 75,637 98        |
| 1912  | 215,238 79                            | 98,191 45        |
| 1913  | 273,226 92                            | 147,258 52       |
| 1914  | 396,179 89                            | 159,352 01       |
| 1915  | 335,811 90                            | 191,471 95       |
| 1916  | 389,223 27                            | 222,047 12       |
| 1917  | 464,891 66                            | 242,530 46       |
| 1918  | 687,652 98                            | 332,487 50       |

In other words, the cost of gas oil in 1916 was nearly sixty per cent of the total expense of production, and in 1917 it was somewhat above fifty per cent.

It may also be instructive to set forth the number of gallons of oil used; the number of gallons per 1,000 cubic feet of gas manufactured; the average cost per gallon and the cost per 1,000 cubic feet manufactured during the years 1909 to 1918.

| Year. | Gallons. | Gallons per 1,000 cubic feet manufactured. | Cost per gal. (cents) average. | Cost per 1,000 cubic ft. manufactured (cents). |
|-------|----------|--------------------------------------------|--------------------------------|------------------------------------------------|
| 1909  | 2,317,309 | 3.80 | 2.09 | 11.03 |
| 1910  | 2,700,091 | 3.93 | 2.60 | 10.21 |
| 1911  | 3,054,858 | 4.08 | 2.48 | 10.10 |
| 1912  | 3,372,346 | 4.04 | 2.91 | 11.76 |
| 1913  | 3,521,912 | 3.95 | 4.18 | 16.51 |
| 1914  | 3,793,171 | 3.97 | 4.20 | 16.68 |
| 1915  | 4,179,926 | 4.13 | 4.58 | 18.92 |
| 1916  | 4,520,841 | 4.22 | 4.91 | 20.72 |
| 1917  | 5,018,086 | 4.07 | 4.83 | 19.67 |
| 1918  | 4,906,614 | 3.35 | 6.78 | 22.73 |

It is insisted on behalf of the defendants that plaintiff's expenditures for gas oil in the year 1916 were excessive because of an improvident contract which it made with the Standard Oil Company of New York on January 19, 1914, for 7,000,000 gallons of oil at four and five hundred and seventy-five one-thousandths cents per gallon. At the time when the contract was made, the plaintiff's supply of oil for the year 1914 was provided for by a previous contract for 3,524,403 gallons at four and eighteen one-hundredths cents per gallon. The amount used in 1914 according to plaintiff's figures was a little upwards of 3,700,000 gallons. It appears that of the oil covered by the January, 1914, contract, only 240,803 gallons were used in that year and that the remaining portion was sufficient to provide for all the oil required for 1915 and for 1916 up to August of that year.

About June, 1914, the price of gas oil dropped to about two and one-half cents. It appears that the Brooklyn Gas Company, the Central Union Gas Company and the Astoria Company had also made contracts with the Standard Oil Company in 1914 at the rate of five cents per gallon, but as a result of negotiations with that company and in consideration of agreeing to contract for an increased supply of gas oil, they succeeded in obtaining a reduction in the price of the oil contracted for in 1914 to an average price of three and three one-hundredths cents per gallon.

The plaintiff also applied for a reduction of the price, but owing to the fact that plaintiff was not prepared to agree to take an additional supply, no modification in the price such as was made with other gas companies was secured.

The defendants argue that not only was the contract improvidently entered into, but that plaintiff

used bad judgment in not procuring a modification of
the agreement. The plaintiff did not attempt to show
why a contract for such a large quantity of oil was
made in January, 1914, for deliveries which extended
to August, 1916, that is to say, a period of two years
and seven months from the date of the contract.
Moreover, it appeared that a prior contract was then
in force which covered practically all the oil that would
be required for 1914. The practice in buying gas oil
seems to have been to enter into a contract some
months before the expiration of the final delivery
under an existing contract and for deliveries to com-
mence upon the expiration of that contract. Such a
practice must commend itself as prudent. But the
length of time for entering into a new contract before
the expiration of the existing contract must be a rea-
sonable one. And where it appears that the supply
for 1914 had been provided for under a prior contract
and where the amount purchased under the new con-
tract was for 7,000,000 gallons, a quantity far in excess
of the reasonable requirements for 1915, and where
in fact it filled the needs for nearly eight months of
1916, it can scarely be claimed that the contract was a
prudent one. The imprudence or lack of ordinary
judgment is emphasized by the fact that the price con-
tracted for was not a low one, but was at a consider-
ably higher figure than in previous years. No reason
was given for making a contract at such a figure in
January, 1914. Besides, it appears from the testimony
of the manager of the Standard Oil Company, with
whom the contract was negotiated, and who was called
as a witness by the plaintiff, that there was no market
price for oil so far as he knew, excepting that he
stated that he regarded the market price as the price
at which his company from time to time sold the
product. The witness also stated that oil was sold in

small quantities at what he termed current prices and that contracts for future delivery, which he considered as a proper procedure, were usually negotiated and that the price resulting from such negotiations, according to his understanding, constituted the market price at that time.

The witness testified that he made contracts in 1915 for deliveries in 1916 and from the memorandum produced by the witness of such contracts made by him and marked in evidence, it appears that in a contract dated February 10, 1915, for 85,000 gallons, the price was three and forty one-hundredths cents per gallon; in one made on March 17, 1915, for 2,750,000 gallons the price was three and seventy-five one-hundredths cents per gallon; in another, made on October 1, 1915, for 2,000,000 gallons the price was three and eight hundred and seventy-five one-thousandths cents per gallon.

It is thus evident that if the plaintiff had adopted the ordinary, prudent course of making contracts, say from year to year, so that oil to be used in 1916 would have been contracted for in 1915, the price of oil for 1916 would have been somewhere from three and seventy-five one-hundredths to three and eight hundred and seventy-five one-thousandths cents per gallon instead of the average price actually paid of four and ninety-one one-hundredths cents per gallon.

In 1916 the plaintiff used upwards of 4,500,000 gallons of oil, which at a saving of even one cent per gallon would have meant a saving in that year in production expenses of upwards of $45,000.

It may be assumed that the contract of 1914 was made in good faith. But the true test in a rate case for determining the cost of the oil for 1916 should be the price at the time when in the usual course a gas manufacturing concern would be expected to purchase

the commodity for that year and not at high prices prevailing in 1914. If the company chooses to speculate or take its chance in making such a contract, the loss should fall upon it and not the public. *Ames v. Union Pacific R. Co.,* 64 Fed. Repr. 165, 177; *Stanislaus Co. v. San Joaquin C. & I. Co.,* 192 U. S. 201; *Cedar Rapids Gas Light Co. v. City of Cedar Rapids,* 144 Iowa, 428, 451.

There is another matter which merits serious consideration and which applies not only to 1916, but also to 1917 and 1918. The gas manufactured in 1916 amounted to 1,070,266,000 cubic feet. The gas sold during the year was 934,406,000 cubic feet. It thus appears that at least 135,860,000 cubic feet of gas are unaccounted for. At the rate of thirty-six cents per 1,000 cubic feet, which plaintiff itself assumes was the cost of gas to it during that year, this loss would represent nearly $50,000. The lost or unaccounted-for gas in 1917 was about 185,322,000 cubic feet, which according to plaintiff's figure of thirty-seven cents a cubic foot during that year would amount to $68,-569.14. The gas unaccounted for in 1918, about 230,-240,000 cubic feet for that year, would represent $108,212,180. The ratio of loss for 1916 was twelve and sixty-nine one-hundredths per cent; for 1917, fifteen and three one-hundredths per cent, and for 1918, upwards of eighteen per cent.

The only explanation for this unaccounted-for gas was given by plaintiff's expert, who merely stated generally that a loss of gas is found in all gas plants, and that it was due to various causes, such as errors in the station meter, defects in consumers' meters which average low, loss due to the contraction of the gas between the temperature at the station meter and the temperature where it is normally measured, stealing of gas, breaks in mains and leakages in con-

nections. It may be assumed that a certain percentage of this unaccounted-for gas is likely to exist in every gas factory, however efficiently managed, but that does not explain whether such a large percentage of unaccounted-for gas as is here shown is usual in well-managed gas factories. It was incumbent upon the plaintiff to establish that its business was conducted efficiently and with due regard to proper economies. The expert witness, however, refrained from giving testimony as to what the percentage of unaccounted-for gas was found to be in other gas-making concerns or whether there is a well-recognized average percentage of loss of gas which is unavoidable, nor was he questioned on these points. The plaintiff has therefore failed to meet the burden of showing that its percentage of unaccounted-for gas is not excessive.

The circumstance, too, that in 1916 the ratio of lost gas was twelve and sixty-nine one-hundredths per cent of the entire output and in 1918 the ratio had increased to eighteen per cent, is an added fact indicating the importance of showing with some reasonable degree of certainty whether such an increased loss could not have been avoided by the exercise of care and efficient management. The failure to furnish proof as to the specific causes to which the losses were attributable is a circumstance strongly pointing to the fact that the loss is excessive and could have been largely reduced by careful supervision.

It should also be noted that plaintiff made no attempt to segregate the results of the first half of 1916 from those of the remainder of the year. The result of the foregoing analysis is that the operating expenses for 1916, as they appear on the plaintiff's books should at least be reduced by $89,692.49, even if no account be taken of the unaccounted-for loss of gas. If that sum be added to $153,878.01, the net

income calculated from plaintiff's books reduced to an eighty-cent rate basis the minimum actual net income which the plaintiff could have enjoyed in 1916 would be the sum of $243,570. At the rate base of $3,041,259, there would have been a return of approximately eight per cent for the year 1916.

It is a matter of common knowledge that in 1917 and 1918 the labor wage was greatly enhanced and the price of materials largely increased.

In the case at bar, despite the higher wages of labor and the higher cost of materials, the court finds that the year 1917 shows substantial earnings at an eighty-cent rate. It is conceded by the plaintiff that the net income for that year, with commercial sales reduced to an eighty-cent basis, would have been $133,265.86, reached as follows: Total revenue, $868,510.77; adjusted operating expenses, $735,244.91.

The adjustment recognized the propriety of excluding rate case expenses for 1917 amounting to $32,-860.12, and reduction in taxes owing to reduced revenue to the amount of $6,713.15. These adjusted operating expenses should be further adjusted by the deduction of $11,827.77 paid to one Mr. Behr, of Chicago, for alleged services, of which $3,590.56 were for services stated to have been performed during December, 1916, and as to the balance, the nature, extent, necessity and reasonableness of those services were not explained.

An item of $1,530, paid as a recording mortgage tax, should be deducted, since it is not chargeable as an operating expense. It should be charged to capital account. An item of $5,000 to Messrs. O'Brien, Boardman & Platt for legal services, said to have begun in July, 1916, which, for aught the court knows, may have been rendered in this case, must also be deducted

for lack of explanation as to the nature of these services, their necessity or reasonableness.

The item of $1,000 paid to one W. E. Freeman as " general auditor " should be disallowed for failure to give proof of the necessity and nature of this work, although plaintiff was asked to do so.

There were other legal expenses, principally to Messrs. Whitney, Ricks & Sullivan, aggregating $4,812, as to which no proof was submitted either as to their reasonableness or necessity.

The criticism heretofore made to the payment of $7,293.30 to the retired superintendent, Mr. Byrnes, is also applicable to 1917.

There were further legal expenses, amounting to $10,594.06, charged as expenses, the necessity for which was not made evident.

There were items such as " promotion management," amounting to $2,862.50, as to which no explanation was given. The amount spent in 1914 under the same title was $600.

Fees for appraisal and commissions paid to David Porter, the real estate expert called to testify as to land values and amounting to $4,710 do not appear to be proper charges. So far as the bill relates to this rate case, it may not be classed as an operating expense. A balance of $2,000 paid to Mr. Porter seems to be for commissions in leasing the land to the Morse Company, a matter wholly unrelated to gas operations.

There are various other items of expenditures criticised by the defendants, which were not satisfactorily explained, not to speak of the large amount of leakage of gas.

Sufficient has already been shown to indicate that the admitted revenue for 1917 of $133,066.91 would be increased by the above mentioned items which

should be disallowed, aggregating at least $55,000, which would bring the net income for 1917 to upwards of $185,000. Taking the rate base as $3,100,000 for 1917, such a revenue would indicate a return of about six per cent. If the plaintiff is charged with a substantial sum for unaccounted leakage, the revenue for that year would have been correspondingly increased.

Coming now to the proofs affecting plaintiff's operations during the year 1918, we find that according to plaintiff's books there was a deficit of upwards of $36,000 for the year. The plaintiff has, however, conceded the propriety of eliminating certain objectionable items, which results in changing the apparent deficit to a net profit of somewhat above $3,000. A comparison of expenses for the years 1917 and 1918 shows that the net production expenses for 1917 amounted to $464,891 and for 1918 to $687,652.96, an increase of $222,761.96.

The "production expenses" according to the method of accounting in vogue in plaintiff's business is made up of the cost of labor, including superintendence of works and cost of boiler fuel, generator fuel, water-gas oil, various supplies and repairs upon the works.

The cost of the three items of boiler fuel, generator fuel and gas oil for those years was as follows:

|  | Boiler fuel. | Generator fuel. | Gas oil. |
|---|---|---|---|
| 1917 ............... | $51,139 | $109,142 | $242,530 |
| 1918 ............... | 116,996 | 168,955 | 332,487 |
| Increases ......... | $65,857 | $59,813 | $89,957 |

The increase of cost in 1918 in these three items over 1917 according to the plaintiff's books was $215,627.

In this connection it is to be noted that in 1916 the plaintiff's accounts show that in the manufacture of 1,070,266,000 cubic feet of gas there were 23,468 tons of coal used, whereas in 1917 29,495 tons of coal were consumed in manufacturing 1,232,741,000 cubic feet of gas and in 1918 39,922 tons of coal were used in the manufacture of 1,463,688,000 cubic feet of gas. Stating it differently, in 1916 there were used forty-three and eight-tenths pounds of coal per 1,000 cubic feet of gas, in 1917 forty-seven and eight-tenths pounds, and in 1918 fifty-four and three-tenths pounds. This large increase for 1918 is unexplained. It was not claimed that the coal in 1918 was inferior to that of 1916. Besides, it should be stated that the system employed for determining the amount of coal used per year was very unreliable and unsatisfactory. It would seem that approximately 10,000 tons should be deducted from the amount claimed to have been used in 1918.

The number of employees in the " commercial department " alone in 1916 was forty-eight; in 1917 the number was fifty-seven and in 1918 it was eighty-eight; that is to say, an increase of forty employees in 1918 over 1916. The salaries and wages of these employees were $41,144.84 for 1916, $49,625.45 for 1917, and $85,481.76 for 1918. One might expect an increase in salaries during that year, but why there should have been so large an increase in the number of employees was not satisfactorily shown.

There are various other items of expense for 1918, particularly in what are generally known as overhead charges, which appear to be excessive. Instead of finding rigid economy in a year of high prices one is impressed with the idea that a policy of extravagance or recklessness had been established.

The net profits of about $3,000 for 1918 might doubtless have been largely increased by strict economy.

The court is of opinion that the items, some of which will appear in the findings of fact, already passed upon and including the excessive use of coal above referred to, and which should be eliminated from the cost account, will amount to approximately $100,000. But it seems to the court to be an unneccessary task to dissect the various items in that year's expenses, since it is quite evident that the excessively high cost of coal and gas oil would point to an inadequate return for that year even if it be assumed that by greater efficiency and economy there would have been a considerable saving in expense.

Oil is by far the largest single item of expense in a water-gas plant and coal the next largest item. The price of oil paid by the company increased from four and eighty-three one-hundredths cents per gallon in 1917 to as much as six and seventy-eight one-hundredths cents in 1918, an increase of nearly two cents. The fluctuation of one cent per gallon is the equivalent of about $50,000 in the annual production expenses of the plaintiff company. There was thus an increase in cost of production in that year of $100,000, due to the increase of cost of oil.

With respect to the items of boiler and generator fuel no one familiar with the prevailing prices of coal was called. Whether the plaintiff contracted for coal and oil at the lowest prices obtainable has not been satisfactorily shown. For example, during 1917 we find that oil was sold in some instances as low as three and twenty-four one-hundredths cents per gallon and at prices ranging in various figures from five and eighty-five one-hundredths cents to eight and ninety one-hundredths cents. In like manner we find that in 1918 the prices ranged from five and eight hundred and seventy-five one-thousandths cents to upwards of ten cents.

As stated by the manager of the Standard Oil Company, there is no market price excepting as it is made upon negotiation. Why this should be so was not shown. The increased cost of labor in the manufacture of the gas is quite negligible so far as the rate of return to the plaintiff is affected.

There was no explanation proffered as to the causes for spasmodic increases in the price of oil or coal. Considering the sharp fluctuations in prices of oil during the years of 1917 and 1918, and in the absence of any explanation as to the reasons therefor, it becomes idle speculation to forecast the price of that commodity, and indeed of coal, for succeeding years. The price may suddenly drop to a point where a substantial return may result to plaintiff.

It is clear that confiscation may not be predicated upon the operations of the plaintiff for 1916 and 1917. As to the years 1917 and 1918 it must at the outset be said that those years were abnormal, owing to the war conditions then existing. Notwithstanding this abnormality, the year 1917 showed a fair return at an eighty-cent rate. It would be safe to assume too that had the eighty-cent rate been charged to customers during that year the increase of the sale of gas would have been considerably increased.

In *Railroad Commission* v. *Cumberland Tel. & Tel. Co.,* 212 U. S. 414, 426, 427, opinion of Mr. Justice Peckham, it is said: " In furnishing gas at reduced rates, the reduction in the rate would very probably result in increased consumption, not only in increased demands from more consumers, but also in increased consumption by consumers already existing, and the increased cost of furnishing the gas would be nothing like in proportion to the increase in consumption."

As to the year 1918 the question that confronts one is whether confiscation should be based upon such a

year, even if it be established with reasonable certainty that the plaintiff's income was thereby reduced to a point which concededly would not be ordinarily deemed an adequate return upon the capital invested.

In the case of a private business the owner may meet the rising cost of labor and material by a corresponding increase in the price of merchandise which he sells. A public service corporation is limited to the rates imposed by law. The merchant, however, is frequently confronted by conditions, such as change of styles or fluctuation in prices of materials, by reason of which the result of the year's business is a loss. Should not a public service corporation also expect to be confronted by the risks of loss arising now and then as incidents of business enterprises? The government in granting a franchise to a public service corporation does not guarantee a profit at every moment of the corporation's activities. All that such a corporation is entitled to is protection against inadequate returns upon its investment which are likely to continue for such a length of time as would result in the impairment of a very substantial portion thereof, or a deprivation of an adequate return upon its capital.

The operations of a fiscal year which was as abnormal as was the year 1918 lack the value of a normal year in determining the future.

In this connection it will be instructive to study the opinions of the courts as to what is meant by a fair return and what period of time should be taken into account in determining the fair return and to what extent abnormal conditions may affect the question of inadequacy of return.

In *City of Knoxville* v. *Knoxville Water Co.,* 212 U. S. 1, 15, the court, per Mr. Justice Moody, said: " We think it was error to confine the investigation to, and base the judgment upon, that year alone. The

precise subject of inquiry was, what would be the effect of the ordinance in the future. The operations of the preceding fiscal year, or of any other past fiscal year, were valueless if the year was abnormal.''

In *Steenerson* v. *Great Northern R. Co.,* 72 N. W. Repr. 713, 721, the court said: '' It is not necessary here to determine just what rate of annual income on the cost of reproducing all of the road except the terminals is the least which the court would uphold before declaring the rates fixed by the commission confiscatory, but we are of the opinion that in such times as existed in 1894 an income of five per cent per annum on such cost is certainly not unreasonably low or confiscatory, and that is as far as it is necessary to go in this case. More especially is this true since it appears from the evidence that in years prior to 1894 this system of roads had produced some very large amounts of income, sufficient to make extraordinary improvements and betterments in the road, as well as ordinary repairs, to pay large dividends, and accumulate a cash surplus which in 1894 amounted to about $3,500,000. * * * The managers of railroads have no right to play with the public the game of ' heads we win, tails you lose.' ''

In *Darnell* v. *Edwards,* 244 U. S. 564, the court affirmed a decree dismissing the bill on the ground that the '' evidence for complainant, tending to show they were non-remunerative, while based upon actual experience in the operation of the road, yet relates to only a brief period when conditions were abnormal.''

In *Village of Saratoga Springs* v. *Saratoga Gas, Electric Light & Power Co.,* 191 N. Y. 123, 149, Chief Judge Cullen, speaking for the court, said: '' We have no difficulty in upholding the provision that the rate shall remain as established for the term of three years. It is urged that circumstances might so alter

that before the expiration of three years a rate which was reasonable at the time it was established would become unreasonable. This is possible, nevertheless we think the legislature was justified in enacting some period of repose during which the rate should remain stable. In answer to this objection we cannot do better than quote the reply made by Chief Justice Holmes to a similar objection in the Massachusetts case cited (*Matter of Janvrin*). He said: ' But supposing a party aggrieved should obtain an injunction, obviously the decree would be drawn so as to bind the defendant for a reasonable time, or if it were drawn in the common form, subject to review on a change of circumstances, the court would not be likely to grant leave to file a bill of review until a reasonable time had elapsed, and if the legislature should say that in these cases five years was a reasonable time, we could not say that it was wrong.' " The opinion of Mr. Justice Holmes, above quoted, is reported in 174 Massachusetts, 514, 519.

In *Municipal Gas Co.* v. *Public Service Commission,* 225 N. Y. 89, 98, Judge Cardozo aptly and tersely said: " For more than nine years the statutory rate was adequate. Abnormal conditions brought about a change, and now, when the return is figured upon the value of the property, the outcome is said to be a deficit. * * * It will seldom be important that rates have been inadequate for a day or a week or a month. Fleeting losses may be suffered, and yet the balance sheet may show a profit. Prolong the loss, however, for a year, and you may reach and cross the danger line. It is by the average of the year that business commonly reckons its losses and its gains. On the other hand, there may be times when the average must be distributed over periods still longer." Are these not such times?

It is also necessary to consider the cases which have treated of the necessity of experimentation under the rate as fixed by the legislature.

In *City of Knoxville* v. *Knoxville Water Co., supra,* the court, per Mr. Justice Moody, said: " We do not feel called upon to determine whether a demonstrated reduction of income to that point would or would not amount to confiscation. Where the case rests, as it does here, not upon observation of the actual operation under the ordinance, but upon speculations as to its effect, based upon the operations of a prior fiscal year, we will not guess whether the substantial return certain to be earned would lack something of the return which would save the effect of the ordinance from confiscation. It is enough that the whole case leaves us in grave doubt. The valuation of the property was an estimate and is greatly disputed. The expense account was not agreed upon. The ordinance had not actually been put into operation."

In *Willcox* v. *Cons. Gas Co.,* 212 U. S. 19, 42, 51, Mr. Justice Peckham, speaking for the court, said: " Of course, there may be cases where the rate is so low, upon any reasonable basis of valuation, that there can be no just doubt as to its confiscatory nature, and in that event there should be no hesitation in so deciding and enjoining its enforcement without waiting for the damage which must inevitably accompany the operation of the business under the objectionable rate. But where the rate complained of shows in any event a very narrow line of division between possible confiscation and proper regulation, as based upon the value of the property found by the court below, and the division depends upon opinions as to value, which differ considerably among the witnesses, and also upon the results in the future of operating under the rate objected to, so that the material fact of value is

left in much doubt, a court of equity ought not to interfere by injunction before a fair trial has been made of continuing the business under that rate, and thus eliminating, as far as possible, the doubt arising from opinions as opposed to facts.  *  *  *  The question of how much an increased consumption under a less rate will increase the earnings of complainant, if at all, at a cost not proportioned to the former cost, can be answered only by a practical test. In such a case as this, where the other data upon which the computation of the rate of return must be based, are from the evidence so uncertain, and where the margin between possible confiscation and valid regulation is so narrow we cannot say there is no fair or just doubt about the truth of the allegation that the rates are insufficient.'' The *Knoxville* and *Willcox* cases have been cited with approval in *Des Moines Gas Co.* v. *City of Des Moines,* 238 U. S. 153, 173, and in *Municipal Gas Co.* v. *Public Service Commission,* 225 N. Y. 89, 97. In the latter case the Court of Appeals, per Judge Cardozo, said: '' Through repeated decisions, there runs the consistent thought that, in controversies of this order, experience is the final test, that the courts must bide their time, and let the workings of the law decide.  *  *  * Bills to annul rates have been dismissed ' without prejudice ' while the outcome remained uncertain. Bills to annul the same rates have afterwards been sustained when the vision of results was clarified by the wisdom that follows the event.''

In *Lincoln Gas & Electric Light Co.* v. *City of Lincoln,* 250 U. S. 256, the United States Supreme Court emphatically reiterated its views as to the importance of a test under the law as follows: ''As early as the month of January, 1909, this court, in two notable rate cases, indicated its view of the importance, in any but a clear case, of subjecting prescribed rates to the

test of practical experience before attacking them in the courts.'' Citing the *Knoxville* and *Willcox Cases,* 212 U. S.

It has also been held that a reduced legislative rate has the effect of largely increasing the income of a public utility company. In the instant case that consideration has a most important bearing, as will presently be shown by the fact that the quality of gas manufactured during 1918 was far below the candle power prescribed by law. Laws of 1906, chap. 125, approved April 3, 1906.

The undisputed evidence of the average candle power per month furnished by the plaintiff to its customers during the year 1918 was as follows:

| | |
|---|---|
| January | 15.55 |
| February | 14.11 |
| March | 11.71 |
| April | 16.94 |
| May | 16.62 |
| June | 12.15 |
| July | 13.34 |
| August | 11.18 |
| September | 12.71 |
| October | 12.21 |
| November | 12.17 |
| December | 14.17 |

During the entire year plaintiff continuously furnished gas of a candle power below the legal standard of twenty-two candles and varying from a maximum monthly average of sixteen and ninety-four hundredths candles to a minimum average of eleven and eighteen hundredths candles. There was not a single day during the year 1918 when the plaintiff furnished gas up to the standard prescribed by law. There were many

occasions when the gas was found to be below ten candles. It was not denied that the plaintiff regularly received copies of the daily reports of the official inspections, and, moreover, the records of previous years show a substantial compliance with the requirements of law in respect of the candle power of the gas sold by plaintiff. In view of these facts and in the absence of any explanation of this seemingly flagrant violation of law, the conclusion seems to be inevitable that the plaintiff's violation of law was deliberate.

The daily tests of gas made by the legal inspectors established that the average quality of the gas supplied by the plaintiff during 1918 was an average of thirteen and fifty-seven hundredths candles instead of twenty-two candles which is the minimum prescribed by law. It follows that the consumer was either compelled to consume a greater quantity of gas measured by the ratio of twenty-two to thirteen and fifty-seven hundredths at a correspondingly increased price to him or that he suffered from the loss of light in the ratio of thirteen and fifty-seven hundredths to twenty-two for which he paid the price charged for gas of a twenty-two candle power standard.

How can one foretell how much increased business the plaintiff would have had if it had furnished the legal twenty-two candle power instead of the very considerably diminished candle power that it furnished in 1918? The use of gas has been largely extended during the past few years for cooking, heating water, house heating and other purposes. A standard quality of gas should insure a more extensive use of gas. At any rate a fair test under the law cannot be made except by compliance with the law which fixes the standard of quality.

Moreover it may well be urged that if the plaintiff has knowingly violated the law by selling gas of a

standard lower than that fixed by law, it is not entitled to equitable relief. Observance of the law is a cardinal principle, which is obligatory upon him who seeks judgment in equity.

The plaintiff has failed to establish confiscation and the complaint must be dismissed, with costs, without prejudice, however, to reopen the case by appropriate proceedings if, after an adequate experimentation under an eighty-cent rate, it believes that it can prove that this rate is confiscatory as to it.

Judgment accordingly.