# GALVESTON ELECTRIC COMPANY *v.* CITY OF GALVESTON ET AL.

APPEAL FROM THE DISTRICT COURT OF THE UNITED STATES
FOR THE SOUTHERN DISTRICT OF TEXAS.

No. 455. Argued December 15, 16, 1921.—Decided April 10, 1922.

1. The fact that a public utility, such as a street railway, may reach financial success only in time, or not at all, is a reason for allowing a liberal return on the money invested in the enterprise; but it does not make past losses an element to be considered in deciding what the base value is and whether a rate fixed is confiscatory. P. 395.

2. A so-called " going concern value and development cost " based on calculations, for various periods, of past deficiencies of net income, allowing 4 per cent. for annual depreciation and 8 per cent. compound interest on the value of the property used as a fair return, should not be included in the base value of appellant's street railway in determining whether an existing rate is confiscatory. P. 395.

3. Neither should an allowance for hypothetical brokerage fees based on a percentage customarily obtained by bankers for financing such enterprises. P. 397.

4. In determining the sufficiency of such rates, the amount normally required for maintenance, not necessarily the amount expended, annually, should be allowed; and many items included in overhead cost of original construction may be excluded in calculating depreciation annuity. P. 398.

5. Appellant's request that prospective cost of maintenance deferred during the war at the wish of the Government be allowed from earnings of future years, in testing the rate, was an attempt to capitalize past losses and rightly refused. P. 399.

6. In calculating whether a rate fixed will yield an adequate return, income taxes which would be payable if a fair return were earned are appropriate deductions from gross revenue. P. 399.

7. But, where the federal corporate income tax, (Act of February 24, 1919, c. 18, §§ 230–238, 40 Stat. 1057, 1075–1080,) is thus deducted, the exemption of the stockholder from the " normal " tax on dividends received from the corporation must be taken into consideration in determining what rate of return to the corporation shall be deemed fair. P. 399.

8. An ordinance rate inadequate when adopted will be valid when, through change of conditions, it yields a fair return.  P. 400.

9. The court knows judicially that prices, in general, and current rates of return on capital have declined since the conclusion of the war, but not the extent to which the economic changes occurring have affected the gross revenues or the net return of the appellant company.  P. 402.

10. A decree of the District Court dismissing without prejudice the bill of a street railway company to restrain enforcement of an ordinance rate as confiscatory, *affirmed*, where an operation test of more than a year and a half was inconclusive because of abnormal economic conditions then existing, and where the lower court's view of the probable future adequacy of the rate was necessarily based largely on prophecy, and was free from substantial error as to the elements to be considered, and where the actual facts were substantially undisputed and the evidence did not compel a contrary conviction.  P. 401.

272 Fed. 147, affirmed.

APPEAL from a decree of the District Court, dismissing, without prejudice, a bill brought by the appellant to restrain the appellees from enforcing a rate fixed for its street railway.

Mr. *William E. Tucker* for appellant.

Mr. *Frank S. Anderson* and Mr. *James W. Wayman* for appellees.

MR. JUSTICE BRANDEIS delivered the opinion of the court.

The street railway system of Galveston was started as a horse-car line in 1881.  It was electrified about 1890; and after the hurricane of 1900 was largely rebuilt.  Upon sale on foreclosure the railway passed in 1901 to a new company; and in 1905 it was purchased by the Galveston Electric Company which supplies to the inhabitants of that city also electric light and power.  At no time has the full fare on the railway been more than five cents—

except during the period of eight months, from October 1, 1918, to June 5, 1919, when six cents was charged. This higher fare was authorized by ordinance of the municipal Board of Commissioners which possesses regulatory powers; and on June 5, 1919, the same Board reduced the maximum fare to five cents. The latter ordinance was passed after a hearing and a finding by the Board that with the reduced rate the company would continue to earn a fair return. Under the 1919 ordinance the company operated for eleven months. Then it brought this suit, in the federal court for southern Texas, to enjoin its enforcement. The company contends that the fare prescribed is confiscatory in violation of the Fourteenth Amendment; the city that it is sufficient to yield a return of 8 per cent. on the value of the property used in the public service.

A temporary injunction having been denied, the court appointed a master to take the evidence and make advisory findings. There was substantially no dispute concerning the facts past or present. It was assumed, in view of then prevailing money rates, that 8 per cent. was a fair return upon money invested in the business. The experts agreed on what they called the estimated undepreciated cost of reproduction on the historical basis; that is, what the property ought to have cost on the basis of prices prevailing at the time the system and its various units were constructed. They agreed also on the amount of gross revenue, and on the expenditures made in operation and for taxes, except as hereinafter stated. The differences between the parties resulted mainly, either from differences in prophecy as to the future trend of prices or from differences in legal opinion as to the elements to be considered in determining whether a fair return would be earned. These differences affected both the base value and the amount to be deemed net revenues. The master, who heard the case in October, 1920, and

filed his report in November, made findings on which he advised that the fare was confiscatory. The District Judge, who heard the case in January, 1921, found a much smaller base value and much larger net revenues; stated that he did not deem it necessary to determine whether the ordinance will " produce exactly 8 per cent., or a little more or a little short of it "; declared that he was " not satisfied that the ordinance produces a return so plainly inadequate as to justify this court in interfering with the action of the municipality in the exercise of its rate-making function "; and in March, 1921, entered a decree dismissing the bill without prejudice. In April he denied a petition for rehearing. 272 Fed. 147. The case comes here on appeal under § 238 of the Judicial Code.

The undepreciated reproduction cost on the historical basis [1]—which seems to be substantially equivalent to what is often termed the prudent investment [2]—was agreed to be $1,715,825. The parties failed to agree in their estimates of the depreciation accrued up to 1921. The master estimated that, based on the 1913 price level, it was $390,000; and this estimate the court accepted. Thus measured, the value of the property, less depreciation, was $1,325,825. The court found that the net earnings under the five-cent fare for the year ending June 30, 1920,

---

[1] That is " the estimated undepreciated cost of reproduction of railway property of the company on the historical basis, exclusive of franchise value, going concern value, bond discount and brokerage fee," but with land and right of way which cost about $15,000 estimated at their present value of $58,836. It was also agreed, for the purpose of dividing joint items, that one-fifth of the property of the company was devoted to its light and power business.

[2] See Richberg, 31 Yale Law Journal, 263, 266, 279; Hale, 30 Yale Law Journal, 710, 720; Henderson, 33 Harvard Law Review, 902 and 1031; Friday, 36 Quarterly Journal of Economics, 197, 211.

had been $90,159, and for the year ending December 31, 1920, $109,286; and estimated that for the year ending June 30, 1921, they would be at least $111,285. The return so found for the year ending June 30, 1920, is 6.8 per cent. of $1,325,825; for the calendar year 1920, 8.2 per cent.; and for the year ending June 30, 1921, 8.4 per cent. The master made calculations only for the year ending June 30, 1920, and, mainly[1] because he allowed an amount for maintenance and depreciation equal to nearly 18 per cent. of the prudent investment for the depreciable property (less accrued depreciation), found the net earnings to be only $50,249.60. This sum is 3.8 per cent. on the prudent investment value, less depreciation. But neither the District Judge nor the master reached his conclusion as to net return by a calculation as simple as that indicated above.

*First.* As the base value of the property, master and court took—instead of the prudent investment value— the estimated cost of reproduction at a later time less depreciation; and in estimating reproduction cost both refused to use as a basis the prices actually prevailing at the time of the hearings. These had risen to 110 per cent. above those of 1913. The basis for calculating reproduction cost adopted by all was prophecy as to the future general price level of commodities, labor and money. This predicted level, which they assumed would be stable for an indefinite period, they called the new plateau of prices. As to the height of this prophesied plateau there was naturally wide divergence of opinion. The company's expert prophesied that the level would be 60 to 70 per cent. above 1913 prices; the master that an increase of 33 1/3 per cent. would prove fair; and the court accepted

---

[1] He allowed also on account of federal income taxes a sum of $8,008 which the court disallowed.

the master's prophecy of 33 1/3 per cent.[1] Thus both master and court assumed a reproduction cost, after deducting accrued depreciation, of about $1,625,000. On this sum the net earnings found by the court yielded—after deducting a 4 per cent. depreciation annuity on property subject to depreciation, a maintenance charge, and a charge for taxes, other than the federal income tax—a net return of 5½ per cent. for the fiscal year ending June 30, 1920; of 6.7 per cent. for the calendar year 1920; and the promise of more for the fiscal year ending June 30, 1921. But to fix base value the master added, and the court disallowed, items aggregating nearly $600,000, which must now be considered.

The most important of these items is $520,000 for "development cost." The item is called by the master also "going concern value or values of plant in successful operation." He could not have meant by this to cover the cost of establishing the system as a physically going concern, for the cost of converting the inert railway plant into an operating system is covered in the agreed historical value by items aggregating $202,000. These included, besides engineering, supervision, interest, taxes, law expenses, injuries and damages during construction, the sum of $73,281 for the expenses of organization and business management. The going concern value for which the mas-

[1] From the agreed valuation of $1,715,825, the court deducted $425,117 for property not subject to this appreciation—land, already given its market value, and capital acquired recently (all acquisitions before January 1, 1915, being assumed to have been at the 1913 price level, all since that date at the new level). The balance was appreciated 1/3; the $425,117 was added again; and accrued depreciation, likewise appreciated 1/3, was subtracted. The court thus obtained a base value of $1,626,061. The master's figure was slightly smaller (but for his inclusion of development cost and brokerage) for he excepted more property from this 33 1/3 per cent. appreciation.

ter makes allowance is the cost of developing the operating railway system into a financially successful concern. The only evidence offered, or relied upon, to support his finding is a capitalization of the net balance of alleged past deficits in accordance with what was said to be the Wisconsin Rule.[1] The experts calculated this sum in various ways. One estimate placed the development cost at $2,000,000; a more moderate estimate by the company's expert was $575,300; and the city's expert made a calculation by which he estimated this so-called cost at $212,452.

If the rule were that a prescribed rate is to be held confiscatory in case net earnings are not sufficient to yield 8 per cent. on the amount prudently invested in the business, there might be propriety in counting as part of the investment such amount, if any, as was necessarily expended at the start in overcoming initial difficulties incident to operation and in securing patronage. But no evidence of any such expenditure was introduced; and the claim of the company does not proceed upon that basis. What was presented by the witnesses are studies, on various theories, of what past deficiencies in net income would aggregate, if 4 per cent. were allowed as a depreciation annuity and 8 per cent. compound interest were charged annually on the value of the property used. These calculations covered, on one basis, the period of 39 years since the original horse-car line was built; on another, the period of 15 years since the appellant purchased the property as a going concern. If net deficits so estimated were made a factor in the rate base, recognition of 8 per cent. as a fair return on the continuing investment would imply substantially a guarantee by the community that the

[1] *Hill* v. *Antigo Water Co.*, 3 Wis. R. R. Com. Rep. 623, 705–723. But see *Cunningham* v. *Chippewa Falls Water Co.*, 5 Wis. R. R. Com. Rep. 302, 315; *Appleton* v. *Appleton Water Works Co.*, 5 Wis. R. R. Com. Rep. 215, 277; *In re Purchase Racine Water Works Plant*, 19 Wis. R. R. Com. Rep. 83, 140.

investor will net on his investment ultimately a return of 8 per cent. yearly, with interest compounded on deferred payments; provided only that the traffic will in course of time bear a rate high enough to produce that amount.[1]

The fact that a utility may reach financial success only in time or not at all, is a reason for allowing a liberal return on the money invested in the enterprise; but it does not make past losses an element to be considered in deciding what the base value is and whether the rate is confiscatory. A company which has failed to secure from year to year sufficient earnings to keep the investment unimpaired and to pay a fair return, whether its failure was the result of imprudence in engaging in the enterprise, or of errors in management, or of omission to exact proper prices for its output, cannot erect out of past deficits a legal basis for holding confiscatory for the future, rates which would, on the basis of present reproduction value, otherwise be compensatory. *Knoxville* v. *Knoxville Water Co.*, 212 U. S. 1, 14.

Nor is there evidence in the record to justify the master's finding that a business brought to successful operation " should have a going concern value at least equal to one-third of its physical properties." Past losses obviously do not tend to prove present values. The fact that a sometime losing business becomes profitable eventually through growth of the community or more efficient management, tends to prove merely that the adventure was

---

[1] On the other hand, if what is to be considered in determining the net deficit is not the result of operations from the beginning of the enterprise, but the result of operations since the present owner acquired it—in other words, the return on its investment—we are left without the data necessary to determine the fact. For the record does not disclose what the present company paid when it purchased the property in 1905 as a going concern. For aught that appears, appellant has received full 8 per cent. annually on that amount and later additions to capital.

not wholly misconceived. It is doubtless true, as the master indicated, that a prospective purchaser of the Galveston system would be willing to pay more for it with a record of annual losses overcome, than he would if the losses had continued. But would not the property be, at least, as valuable if the past had presented a record of continuous successes? And shall the base value be deemed less in law if there was no development cost, because success was instant and continuous? Or, if the success had been so great that, besides paying an annual return at the rate of 8 per cent., a large surplus had been accumulated, could the city insist that the base value be reduced by the amount of the surplus? Compare *Newton v. Consolidated Gas Co.*, ante, 165.

In determining the value of a business as between buyer and seller, the goodwill and earning power due to effective organization are often more important elements than tangible property. Where the public acquires the business, compensation must be made for these, at least under some circumstances. *Omaha v. Omaha Water Co.*, 218 U. S. 180, 202, 203; *National Waterworks Co. v. Kansas City*, 62 Fed. 853, 865. And they, like past losses, should be considered in determining whether a rate charged by a public utility is reasonable. Compare *Venner Co. v. Urbana Waterworks*, 174 Fed. 348, 352. But in determining whether a rate is confiscatory, goodwill and franchise value were excluded from the base value in *Cedar Rapids Gas Light Co. v. Cedar Rapids*, 223 U. S. 655, 669, and *Des Moines Gas Co. v. Des Moines*, 238 U. S. 153, 169; and the expressions in *Denver v. Denver Union Water Co.*, 246 U. S. 178, 184, 191, and in *Lincoln Gas & Electric Light Co. v. Lincoln*, 250 U. S. 256, 267, are not to be taken as modifying in any respect the rule there declared. Going concern value and development cost, in the sense in which the master used these terms,

are not to be included in the base value for the purpose of determining whether a rate is confiscatory.

The other item included by the master in determining base value, but disallowed by the court, is $67,078 for brokerage fees. There is no evidence that any sum was in fact paid as brokerage, and there was included, as above shown, the sum of $73,281 for organization and business management in calculating the historical reproduction cost. The finding of the master rests upon testimony that bankers customarily get, in some form, compensation equal to 4 per cent. on the money procured by them for such enterprises.[1] But compensation for bankers' services is often paid in the lessened price at which they take the company's securities, and is thus represented in the higher rate of interest or dividend paid on the money actually received by the company as capital. The reason given by the master for including the allowance for an assumed brokerage fee, is that a brokerage fee is " a normal incident of large industrial investments, and has not been amortized," since " the record shows that . . . the plant has been operated at a loss." If base value were to be fixed by the money expended, brokerage fees actually paid might with propriety be included, as are taxes paid pending construction. But as the base value considered is the present value, that value must be measured by money; and the customary cost of obtaining the money is immaterial. We cannot say that the court erred in refusing to include in base value an allowance for hypothetical brokers' fees.

The appellant insisted also that the base value should be raised by assuming that the future plateau of prices would be 60 to 70 per cent. above the historical reproduc-

[1] The record cost of the property was originally used as the base for this calculation. But, the figure $67,078 was tacitly agreed by both parties to be the amount, if any, that should be allowed for brokerage.

tion value instead of 33 1/3 per cent. as the master and
the court assumed. The appellees insisted, on the other
hand, that an item of $142,281 for grade raising included
by master and court in the historical cost should be elim-
inated. We cannot say that there was error in overruling
these contentions.

. *Second.* Concerning deductions to be made from gross
revenue in order to determine net earnings, the court dif-
fered from the master in regard both to the yearly charge
for maintenance and to the depreciation annuity. It ap-
peared that in the fifteen years since appellant acquired
the system in 1905, the average annual expenditure for
maintenance had been $42,771; that during the war the
property had been admittedly undermaintained; that the
expenditure was $64,108 in the calendar year 1919;
$80,322 in the fiscal year ending June 30, 1920, and $90,-
861.28 in the calendar year 1920. The court estimated
the proper charge for current maintenance at $70,000, and
allowed, in addition, a depreciation annuity of $45,245
(that is, 4 per cent. on property subject to depreciation)
to provide a fund out of which annual replacements and
renewals could be made. Thus the court allowed for the
year's depreciation and maintenance $115,245, which is
nearly 14 per cent. of the historical reproduction value,
and about 10 per cent. of the assumed reproduction cost,
of the depreciable part of the system. The master al-
lowed $147,146.40 for maintenance and depreciation dur-
ing the year ending June 30, 1920. This larger figure was
arrived at, partly by charging as cost of maintenance the
full $80,322 expended during that year, and partly by in-
cluding as depreciable property expenditures for overhead
items which the court excluded. The proper annual
charge for maintenance is the amount normally required
for that purpose during the period; it is not necessarily
the amount actually expended within the year. Many
items included in the overhead cost of original construc-

tion may properly be excluded in calculating the amount of the depreciation annuity. We cannot say that the court erred in limiting the year's maintenance and depreciation allowances to an aggregate of $115,245.

The company asked to have allowed as a further charge $29,500 a year on account of what it called deferred maintenance. The contention is that, during the war and two years following, the company had deferred maintenance, pursuant to a policy established at the express request of the Government to the end that material and labor might be released for war purposes; that to make good this deferred maintenance would cost $197,000; and that in order to amortize this amount an annual allowance from earnings of $29,500 should be made for five years. This is an attempt, in another form, to capitalize alleged past losses; and the request was properly refused both by the master and the court.

*Third.* The remaining item as to which the master and the court differed relates to the income tax. The company assigns as error that the master allowed, but the court disallowed, as a part of the operating expenses for the year ending June 30, 1920, the sum of $16,254 paid by the company during that year for federal income taxes. The tax referred to is presumably that imposed by the Act of February 24, 1919, c. 18, §§ 230–238, 40 Stat. 1057, 1075–1080, which for any year after 1918 is 10 per cent. of the net income. In calculating whether the five-cent fare will yield a proper return, it is necessary to deduct from gross revenue the expenses and charges; and all taxes which would be payable if a fair return were earned are appropriate deductions. There is no difference in this respect between state and federal taxes or between income taxes and others. But the fact that it is the federal corporate income tax for which deduction is made, must be taken into consideration in determining what rate of return shall be deemed fair. For under § 216 the stock-

holder does not include in the income on which the normal federal tax is payable 'dividends received from the corporation. This tax exemption is therefore, in effect, part of the return on the investment.[1]

It is thus clear that both in the year ending June 30, 1920, and in the calendar year 1920, the net earnings of the system were less than 8 per cent. of its value, whether the value be estimated on the basis of prudent investment or on the basis of the reproduction cost actually adopted. When the court rendered its decision the ordinance had been tested for more than a year and a half—a period ample in ordinary times to test the current effect of the rate prescribed and to indicate its probable effect in the near future. The times here involved were, however, in a high degree abnormal. It did not follow that, because the system had earned less than 8 per cent. in 1919 and in 1920, it would earn less than 8 per cent. in 1921. A rate ordinance invalid when adopted may later become valid, just as an ordinance valid when made may become invalid by change in conditions. *Municipal Gas Co.* v.

---

[1] It is difficult to see how, on the facts presented, so large a sum as $16,254 could have been paid on account of the year's operation. Indeed the court, in disallowing the item of federal income tax, deducted not $16,254, but $8,008. Even this seems too large, for the net earnings, without deduction of the $16,254 attributed to income tax, for the year ending June 30, 1920, as found by the master, were $66,503.60. From this, interest paid or accrued on indebtedness is to be deducted before computing the net income on which the tax is payable. A large part of the capital of utility companies is ordinarily represented by interest-bearing bonds and notes; and there is evidence that such indebtedness of the appellant was "in the neighborhood of $1,400,000." The interest on this debt chargeable to the railway system would be at least $50,000. There is further an exemption from tax of $2,000 of the net income. So a 10 per cent. tax on the balance would amount to less than $1,500.

In the record and briefs elsewhere the income tax is reckoned at between $8,000 and $10,000, which is a proper figure if there be an 8 per cent. return on $1,626,061.

*Public Service Commission,* 225 N. Y. 89, 96.  Compare *Willcox* v. *Consolidated Gas Co.,* 212 U. S. 19; *Newton* v. *Consolidated Gas Co., ante,* 165.

The District Judge was obliged to form an opinion as to the probable net earnings in the future.  All relevant facts, except as stated, and all applicable arguments were fully and clearly presented by the parties and were carefully considered by the court.  Although the District Judge treated the master's report as advisory merely, he passed upon the numerous exceptions taken to the master's findings in order to indicate his view on the precise points raised.  He allowed some exceptions and disallowed others.  Upon petition for rehearing further careful consideration was given to the case.  Views expressed in the first opinion on some matters were modified; but these changes did not call for any change in the decree.  The District Judge had before him some evidence not before the master; for the company's expert was recalled and testified both to the result of operations of later months in which there was a large increase in travel and to the heavy decline in prices which occurred after October.  Concerning actual facts there was substantially no controversy.  On the elements to be considered in determining whether the rate would be confiscatory no error was made which could substantially affect the result.  His determination whether the prescribed rate would be confiscatory was necessarily based largely on a prophecy, for normal conditions had not been restored.  He found that gross revenues were steadily increasing; and that they were larger under the five-cent fare than they had been during the preceding year when the six-cent rate was in effect.  He was convinced that operating costs would decrease largely during the year.  His two opinions show that every element upon which his prophecy should be based received careful consideration.  We cannot say that the evidence compelled a conviction that the rate would

prove inadequate. Compare *San Diego Land & Town Co.* v. *National City,* 174 U. S. 739, 754. *San Diego Land & Town Co.* v. *Jasper,* 189 U. S. 439; *Knoxville* v. *Knoxville Water Co.,* 212 U. S. 1, 17.

The occasion for the suit was solely the extraordinary rise in prices incident to the war. There was no suggestion that the action of the Board evidenced hostility to the utility, or that the Board was arbitrary or hasty. It had been theretofore considerate of the company's rights and needs. When prices rose rapidly in 1918, it raised the fare limit to six cents, although the franchise ordinance prescribed the five-cent fare. And this was before our decision in *San Antonio* v. *San Antonio Public Service Co.,* 255 U. S. 547. Its reduction of the fare by ordinance of June 5, 1919, was made after hearing, and was doubtless due to the conviction, shared by many, that, with the cessation of hostilities and the negotiation of the Peace Treaty, prices and operating cost would fall abruptly. This prophecy, if such there was, proved false. But nearly three years have elapsed since the Board adopted the ordinance; and more than a year since entry of the decree below. We know judicially that the period has, in general, been one of continuous price recession, and that the current rates of return on capital are much lower than they then were.[1] But we cannot know to what extent the important changes occurring have affected either gross revenues or the net return. There is no reason to believe that the Board would not give full and fair consideration to a proposed change in rate if application were now made to it. And the District Judge stated in his opinion (272 Fed. 147), that the decree to be entered would be vacated or amended in case it should later appear that the regulating board declined such adjustment of rates as the ac-

---

[1] See Federal Reserve Bulletin, January, 1922, pp. 5, 79, 113; February, 1922, pp. 156–7.

tual experience of the utility might show it entitled to; and the decree was thereupon entered without prejudice.

The District Judge refused a temporary injunction and did not exact a bond. Hence the only relief we can grant is such as operates *in futuro*. Compare *Duplex Printing Press Co.* v. *Deering*, 254 U. S. 443, 464. An injunction should not issue now, unless conditions are such that the prescribed rate is confiscatory. As by the reservation in the decree appellant may secure protection against the ordinance if under existing conditions the five-cent rate appears to be inadequate, the decree should be affirmed. Compare *Lincoln Gas & Electric Light Co.* v. *Lincoln*, 250 U. S. 256, 268; *Ex parte Lincoln Gas & Electric Light Co.*, 256 U. S. 512; 257 U. S. 6.

*Decree affirmed.*