RENO POWER, LIGHT & WATER CO. v. PUBLIC SERVICE COMMISSION OF NEVADA et al.

(District Court, D. Nevada.    June 4, 1923.)

No. B-30.

1. Gas ⬤⟜14(1)—Reproduction costs considered in ascertaining value.

Reproduction costs of a gas plant at prevailing prices is a highly important fact to be considered in valuation for rate-making purposes, but is not necessarily controlling.

2. Gas ⬤⟜14(1)—Owners of public utility entitled to fair return.

All that owner of public utility is entitled to is a fair return on reasonable value of its property at and during time it is so used.

3. Gas ⬤⟜14(1)—Elements considered in determining value of public utility.

Reasonable value of public utility property should be gathered from a careful and comprehensive consideration and comparison of its original cost, cost of reproduction new, depreciation, additions, improvements, present and probable future revenues and expenses, market value of stocks and bonds, and any factor or circumstance which adds to or takes from its value.

4. Gas ⬤⟜14(1)—Deficiency of past income not considered in fixing value of public utility.

Deficiency in past income is not property used by public, and is not part of reasonable reproduction value on which public utility company is entitled to fair or any return.

5. Gas ⬤⟜14(1)—Going concern circumstance in fixing value.

Circumstance that gas company is going concern rather than plant without customers or business is property, and should be given due weight in fixing reasonable value for rate-making purposes.

6. Gas ⬤⟜14(1)—Five per cent. allowed for going concern.

Five per cent. of value of physical elements of gas plant *held* sufficient sum to add because company was going concern, where it had no competitor.

7. Gas ⬤⟜14(1)—Cost of obtaining capital not value for rate making.

Cost of obtaining capital to erect a public utility plant is not property which will be used in serving public, and cannot be considered in valuation for rate-making purposes.

8. Gas ⬤⟜14(1)—Fifteen per cent. of base value allowed for overhead expenses in valuation of plant.

In determining value of gas plant for rate-making purposes, an allowance of 15 per cent. on base value of plant allowed for overhead expenses.

9. Gas ⬤⟜14(1)—Deductions allowable for depreciation in determining value.

Where physical items of gas plant have been appraised at what it would cost to reproduce them new, and they are not new, accrued depreciation must be found and deducted for rate-making purposes.

---

⬤⟜For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

10. Gas ⬦⟹14(1)—Allowance for working capital stores and supplies proper.

An allowance for working capital for stores and supplies is proper in fixing rates.

11. Gas ⬦⟹14(1)—Amount allowable for working capital.

An amount equal to ordinary expenditures of a gas company for two months is sufficient allowance for working capital in fixing rates.

12. Gas ⬦⟹14(1)—Operating expenses must be reasonable.

To be allowable in a rate case, operating expenses are limited to reasonable cost of efficient ordinary operation.

13. Gas ⬦⟹14(1)—Cost of enlarging and improving plant included in value and excluded from operating expenses.

Cost of enlarging and improving plant is investment, and should be fairly included in the reasonable value of utility, and every item thereof ought to be strictly excluded from operating expense account.

14. Gas ⬦⟹14(1)—Bad debts not considered in fixing rates.

Bad debts cannot be considered in determining whether rates are confiscatory, except on satisfactory evidence that company was not at fault.

15. Gas ⬦⟹14(1)—Expense hearings not considered in fixing rates.

Expense of rate hearings are deemed abnormal, and are not considered in determining whether rates are confiscatory.

16. Gas ⬦⟹14(1)—Expenditures not considered in fixing rates, unless beneficial to rate payers.

Charges for picnics, photographs, rodeo stock, charitable organizations, magazines, newspapers, floral pieces, and music cannot be imposed on rate payers, unless in some way they may be shown to be incurred in service of and for benefit of rate payers.

17. Gas ⬦⟹14(1)—Burden on public utility to show operating expenses reasonable.

In suit by public utility to enjoin rates as confiscatory, burden is on plaintiff to show necessary reasonable cost of operation as well as reasonable value of its property.

In Equity. Suit by the Reno Power, Light & Water Company against the Public Service Commission of Nevada and others. Bill dismissed without prejudice.

Cheney, Downer, Price & Hawkins and Hoyt, Norcross, Thatcher, Woodburn & Henley, all of Reno, Nev., for plaintiff.

Leonard B. Fowler, Atty. Gen., and Robert Richards, Asst. Atty. Gen., for defendants Public Service Commission and others.

Leroy F. Pike, City Atty., of Reno, Nev., for city of Reno.

FARRINGTON, District Judge. Plaintiff, a California corporation, is and for a number of years past has been, supplying the people of Reno and Sparks with gas. In March, 1921, the company, in accordance with section 14 of the Public Utility Act of Nevada (Stats. 1919, p. 203), filed with the Public Service Commission a new schedule of rates and charges, increasing its then rates about 39 per cent., to become effective on the 19th day of the following month. June 10, 1921, an order was issued by the Public Service Commission, disapproving the new schedule, on the ground that the rates then in force were just and reasonable to the public, and should yield an adequate return upon the fair and reasonable value of the property of the company. All increase whatever in rates was denied. The present suit

was then commenced, the purpose being to obtain an injunction restraining defendants from enforcing the order. A temporary restraining order and an injunction pendente lite issued, under which the company was permitted to collect the rates provided in its proposed schedule, but only upon condition that all amounts so collected, in excess of what would have been collected under the former schedule of rates, be deposited in the Farmers' & Merchants' National Bank of Reno.

Plaintiff claims that the value of its plant is more than $500,000; that the gross income it will receive under the new schedule, if enforced, will not exceed the sum of $157,791; that its operating expenses, including taxes, for the year 1921, will exceed $98,831; that the gross operating revenue it will receive under the schedule of rates fixed by the order of the commission will not exceed $113,681, and the net operating revenue, after deducting operating costs, expenses, taxes, and maintenance, will not exceed the sum of $21,100; that its operating expenses, including taxes, for the year 1920, were in excess of $92,612; that the depreciation heretofore and now taking place on its property is in excess of 2 per cent. per annum; that $8,000 is a fair and just sum to be allowed plaintiff as a depreciation annuity; that the current rate of interest in the vicinity on secured loans is 8 per cent., and 12 per cent. is the lowest rate sought and generally obtained on capital invested in banking, merchandising, and other business in Reno, Sparks, and vicinity; that under the schedule of rates fixed by the Commission, if enforced, the net return of $13,100 to plaintiff upon its property will be less than 2.6 per cent. per annum, and will operate to deprive plaintiff of its property without due process of law, and amount to a taking of its property for public use without just compensation.

Defendants deny a value to the property in excess of $290,732; allege that the gross income under the new schedule of rates will greatly exceed $157,791; deny that the operating expenses for the year 1921 will amount to $98,831, or, including taxes and depreciation, will exceed $90,055.22; deny that the operating expenses for 1920, including taxes, costs, and maintenance, were in excess of $92,612, or exceeded $89,922; allege that the gross revenue which will be collected under the rates fixed by the commission's order will not be less than $126,560; that the net revenue after deducting operating costs, expenses, taxes, and maintenance, will exceed $23,000, and will yield a net return to plaintiff upon its property of not less than 8 per cent. per annum.

The value of the property is $290,732 according to Commissioner Scrugham. As found by Commissioner Shaughnessy it is $276,514.84. Commissioner Shaughnessy joined with Commissioner Scrugham in the order denying an advance in the rates. Commissioner Simmons, dissenting, found the value of the property to be $325,660. The answer, as I understand it, admits that the property in question has a value of $290,732, and that $4,600 is a fair and reasonable depreciation annuity.

The appraisement made by P. M. Wentworth, assistant manager of the company, on which plaintiff relies, is as follows:

Estimated Cost to Reproduce New, Inventory and Prices as of September 1, 1921.

| | | |
|---|---|---:|
| 1. | Gas mains | $86,241 |
| 2. | Gas services | 55,121 |
| 3. | Gas meters | 54,979 |
| 4. | Gas plant buildings | 23,327 |
| 5. | Miscellaneous buildings | 1,077 |
| 6. | Gas making and storage equipment | 99,085 |
| 7. | Shop equipment | 1,770 |
| 8. | Tools and instruments | 1,723 |
| 9. | Furniture and fixtures | 1,496 |
| | | $324,819 |
| 10. | Engineering, 5 per cent. on items 1–9, inclusive | 16,241 |
| 11. | Business management 5 per cent. on items 1–9, inclusive | 16,241 |
| | | $357,301 |
| 12. | Legal and general expense, 2½ per cent. on items 1–11, inclusive | 8,932 |
| | | $366,233 |
| 12a. | Taxes during construction—3.35 per cent. on one-half of items 1–12 | 6,134 |
| | | $372,367 |
| 13. | Interest during construction—6 per cent. on items 1–12a | 22,342 |
| | | $394,709 |
| 14. | Contingencies—5 per cent. on items 1–13 | 19,735 |
| | | $414,444 |
| 15. | Brokerage—5 per cent. on items 1–14 | 20,722 |
| | | $435,166 |
| 16. | Stores and supplies | 12,520 |
| 17. | Working cash capital | 15,754 |
| 18. | Real estate | 1,650 |
| 19. | Legal expense, taxes, interest and brokerage, 18.12 per cent. | 200 |
| | | $465,290 |
| | Total physical property | $465,290 |
| | Development cost | 80,000 |
| | Total fair value as of September 1, 1921 | $545,290 |

[1] Mr. Wentworth's appraisal was carefully made, but apparently on the theory that the company should have a return upon such an amount as it would cost to reproduce the plant new at the prices, whether high or low, prevailing at the time the appraisal is made. Undoubtedly reproduction cost so ascertained is a highly important fact to be considered, but it is not necessarily controlling.

[2, 3] All that the owner of property devoted to public use is entitled to is a fair return upon its reasonable value at and during the time it is so used. When rates are promulgated it is not contemplated that they are to be raised or lowered with each fluctuation in prices. Industries relying upon the services of the utility, for obvious reasons, would regard with disfavor and apprehension the uncertainty and confusion which would be engendered by frequent changes. It is highly desirable that rates should be constant over as long a period as

possible; hence, when fixed, they should be based on values and prices which will be reasonable, not merely at the instant when the appraisal is made but for the future, remembering that the common prosperity is best promoted by stable rates and by elimination of uncertain and speculative conditions. The rule is that the reasonable value of public utility property should be gathered from a careful and comprehensive consideration and comparison of its original cost, the cost of reproduction new, depreciation, additions, improvements, present and probable future revenues and expenses, market value of the stocks and bonds of the corporation which owns the property, and, in short, any factor or circumstance which adds to or takes from its value, giving to each such weight as may be just and right.

As was said by this court in the Reno Water Rate Case, 300 Fed. ——, decided July 11, 1921:

"It is significant that, in practically every statement of this rule, value is qualified by the adjectives 'fair' or 'reasonable.' Neither original cost, reproduction cost, reproduction cost less depreciation, market value of the stock and bonds, or any other single circumstance, is necessarily controlling or equivalent to reasonable value. True, in many cases the courts have approved the reproduction cost less depreciation method, but we must not lose sight of the fact that it is only one of the guides in the quest for reasonable value. In times when prices and the value of money and property are stable, it is frequently the best and most reliable index of reasonable present value, but in times of abnormally high or unusually low prices, a condition which in its nature must be temporary, the then reproduction cost would be unjust to the owners of the utility or to the public which it serves. * * *

"No single method of appraising the value of such property has yet been found which is entirely satisfactory. Effort is usually made to employ the reproduction cost method formula; but each person who engages in the solution of the problem quickly finds no formula is possible. His way is beset with uncertainties at very step. Few of the factors with which he has to deal are either constant or certain, and finally, when a result is reached, it usually must be modified by subtracting some amount, large or small according to the judgment of the appraiser, for depreciation, or by arbitrarily adding for development cost, contingencies, and the like, so that the final result may be approved, on the whole, as reasonable.

"If the value of the property and the rates are to be adjusted to the prices of to-day, they should be readjusted to-morrow to suit to-morrow's prices. * * * If a rate is fixed by the rate-making body, it should not be for one day or for one month, but with the idea of covering justly fluctuations for as long a period as possible. A rate-making body should provide, not for the past or merely for the present, but for the future. * * *

"I conclude that the rule requiring the base value on which rates are calculated to be reasonable, and the rate of return to be fair, is economically sound; and this, I take it, means not merely fair and reasonable for the instant, but for some reasonable period in the immediate future. Few cases can be found in which it is held that, in fixing reasonable value, reproduction cost is the sole determining factor."

If it were possible to find with confidence the original cost of the plant and of subsequent additions thereto, and to know that the original construction was prudently conceived and economically managed, some light might be afforded as to present reasonable value by applying to the original cost a percentage factor which represents the difference between present prices and those prevailing during the period of construction. But unfortunately the books of the company show-

ing cost are not available. Mayor Stewart, who was city engineer during the period of construction, says the estimated cost was about $125,-000. He considers the present undepreciated value of the property to be $244,885.64; to this he adds $12,000 for betterments between January 1, 1921, and the date of the hearing in the same year. His appraisal contains no sufficient additions for appreciation in value of the property, or for advance in the prices of machinery, structural material, and appliances used in the plant, nor does it have any regard for accrued depreciation. The evidence as to original cost is too meager and indefinite to be of assistance.

Mr. Nash, an economist, a witness for plaintiff, gives it as his opinion that prices are now about 60 per cent. higher than in 1914, and that they will remain at that level for a considerable time in the future; but Professor Wilcox, of the Nevada State University, says he believes. there is a downward tendency of prices in view, but that any prediction at this time is very problematical and tentative, and only for a short time. While the curve of prices is downward, it is not safe to make a prediction, and it is utterly impossible for an economist who knows what he is talking about to name any definite figure.

The Supreme Court, in Galveston Electric Co. v. Galveston, 258 U. S. 388, 402, 42 Sup. Ct. 351, 357 (66 L. Ed. 678) speaking in April, 1922, of the preceding period of 34 months, said:

"We know judicially that the period has, in general, been one of continuous price recession."

The last index of wholesale prices compiled by the United States Department of Labor, a copy of which has been furnished by plaintiff's attorneys, shows that since September, 1921, when Mr. Wentworth's appraisal was made, prices for metals and metal products, building materials and commodities in general, have steadily, though slowly, advanced. Whether the process of deflation which seems to have commenced in the latter part of 1920 has run its course, whether prices are to rise or fall, are questions I shall not attempt to answer.

Mr. Wentworth's appraisal of the physical features of the plant at $324,819 will be allowed, because the evidence in the record, which I am at liberty to consider, affords no reliable data by which his estimates or prices can be tested. His prices were obtained principally from dealers in San Francisco, and no countervailing testimony has been presented. The books which might have shown original cost were destroyed in the San Francisco fire in 1906, and Mr. Stewart's memory goes, not to the cost or to any of the details, but only to estimated original cost.

The claim of $80,000 for development cost is plainly an attempt to capitalize alleged deficiency of income for the years 1906 to 1920, inclusive, and to require present users of gas to pay part of the rates which were not collected from former customers. The position of the company would be better, if some satisfactory explanation were offered as to why, during the years prior to 1919, when there was no commission, the company neglected to exercise its legal right to charge and collect a fair price for gas, if its then prices were insuffi-

cient. There is no showing that additional rates could not have been collected. .

[4] Deficiency of income is not reasonable value. It is not property which is being used by the public; it is not reasonable reproduction value, on which the company is entitled to a fair or any return. Knoxville v. Knoxville Water Co., 212 U. S. 1, 14, 29 Sup. Ct. 148, 53 L. Ed. 371; Galveston Electric Co. v. Galveston (D. C.) 272 Fed. 147, 160; Id. 258 U. S. 388, 395, 42 Sup. Ct. 351, 66 L. Ed. 678.

[5] True, the circumstance that the company is a going concern, rather than a plant without customers or business, is property, and should be given due weight in fixing the reasonable value on which the company is entitled to a fair return. What, then, is the difference in value of the gas plant with its present business established, and the same plant in the same community ready to do business, but as yet having none? What would it cost to secure the present patronage and organization, and have in operation the present business system? The company has, and probably would have, no competitor; people who need gas would be compelled to apply to it or go without.

[6] The courts have frequently allowed amounts for going concern varying from about 4 per cent. to 15 per cent., but in the instant case I see no reason why 5 per cent. of the value of the physical elements of the plant is not a sufficient sum to add, in a suit where the purpose is to determine whether proposed rates are confiscatory or not. Spring Valley Water Co. v. City and County of San Francisco (D. C.) 252 Fed. 979, 985; City of Minneapolis v. Rand (C. C. A.) 285 Fed. 818, 830.

[7] There is no evidence that any brokerage was ever paid; $20,-722, the amount fixed by the witness Wentworth, is purely an estimate by an expert. One man, with abundant capital or excellent credit, may be able to construct a plant without employing brokers or issuing bonds; another, with little capital and but indifferent credit, may be obliged to pay large fees for marketing his securities, and realize from them much less than their face value. This cost of obtaining capital to erect a public utility plant is not property which will be used in serving the public. It is not basic value. It is an index of the promoter's lack of credit and capital, rather than of reasonable value. Galveston Electric Co. v. Galveston, 258 U. S. 388, 397, 42 Sup. Ct. 351, 355 (66 L. Ed. 678). In that case the court said:

"As the base value considered is the present value, that value must be measured by money; and the customary cost of obtaining the money is immaterial."

[8] There is nothing in the record which demands an allowance of $19,735 for contingencies. During original construction there are always unexpected difficulties and emergencies; there are also changes and alterations to adapt the component parts of the plant to each other. But when the plant is reconstructed, such contingencies are relatively few. The equity of such an allowance to cover omissions is not clear. The tendency of appraisers seems to be quite as strong to overestimate as to underestimate quantity, quality, numbers, and value.

The company here has not supported its claim for overhead allowances by any record of expenses actually incurred, but relies entirely on expert opinion based on conditions more or less hypothetical. Obviously such estimates are largely speculative. Overhead expenses amounting to $48,723, or 15 per cent. on the base value will be allowed. Des Moines Gas Co. v. Des Moines, 238 U. S. 153, 162, 35 Sup. Ct. 811, 59 L. Ed. 1244.

Plaintiff contends that no deductions should be made from Mr. Wentworth's appraisal for accrued depreciation; but all constructions like those here in question are deteriorating; sooner or later they become useless or inadequate, and must be replaced. To cover this loss plaintiff claims it is entitled to a depreciation annuity of 2 per cent. on the physical items, plus overhead charges, or an annual allowance of $8,000, and fortifies this claim by testimony of Mr. Wentworth to the effect that the life of the structural portions of the plant is from 10 to 50 years, and the annual depreciation about $11,-982, or 3.68 per cent.

[9] The argument that accrued depreciation has been taken care of by reducing the claim for development cost from $169,966 to $80,000 has the same infirmity which inheres in the demand for development cost itself. If there can be no allowance for development cost, aside from going concern value, depreciation has not been taken care of. The physical items of the plant have been appraised at what it would cost to reproduce them new, but they are not new; they have depreciated. This accrued depreciation must be found and deducted; if not, the reproduction valuation is something in excess of reasonable value. Knoxville v. Knoxville Water Co., 212 U. S. 1, 10, 29; Minnesota Rate Case, 230 U. S. 352, 357, 358, 33 Sup. Ct. 729, 57 L. Ed. 1511, 48 L. R. A. (N. S.) 1151, Ann. Cas. 1916A, 18; Galveston Electric Co. v. Galveston (D. C.) 272 Fed. 147, 159.

[10] The estimated amounts for working capital, stores, and supplies are $15,754 and $12,520, respectively. An allowance for working capital for stores and supplies seems to be proper, and to have been approved by the courts. Whitten on Valuation of Pub. Serv. Corp. 287; City of Minneapolis v. Rand (C. C. A.) 285 Fed. 825.

[11] It is necessary that the company should have on hand at all times a sufficient amount of money to meet its current expenses, and a reasonable quantity of such supplies, stores, and repairs as are constantly being used and consumed in the manufacture of gas; but rates are collected monthly, and when received are at once available to meet the pay roll and other current outlays. For this purpose it would seem that an amount equal to its ordinary expenditures for two months should be sufficient.

The appraisement of stores and supplies presented in evidence is certainly lacking in detail. It is impossible to determine what supplies are on hand, in what quantities they are usually kept, or at what prices they are valued. Whether they are necessary, or whether some of them have merely been ordered, but not yet received, is not disclosed in the appraisement. The sum of $16,000 will be allowed for these two items. I find the valuation of the plant as follows:

Physical property...............................................................  $324,819
Going concern.................................................................  16,241
Overhead costs, such as engineering, management, etc...............  48,723
Real estate......................................................................  1,650
Stores and supplies, working cash capital............................  16,000
                                                                           _____
                                                                          $407,433
Deducting 20 per cent. for depreciation...........................  64,963
                                                                           _____
Present reasonable value......................................................  $342,470

Defendants have admitted that $4,600 is a reasonable amount to be allowed as a depreciation annuity, and this in my judgment is quite as generous to the company as the evidence will justify. If, as Mr. Wentworth testified, after the plant has been in operation more than 16 years, the accrued depreciation amounts to no more than 20 per cent., it is difficult to discover any equitable reason for allowing as a depreciation annuity any more than defendants have conceded, $4,600.

The following table shows the gross earnings, operating expenses, and taxes, and the apparent net earnings, of the company for the years 1906 to 1920, inclusive, as shown by Plaintiff's Exhibit C, and similar items for the year commencing April 1, 1921, from Plaintiff's Exhibit I (where the year 1921 is used hereafter in this decision, the year commencing April 1, 1921, and ending March 31, 1922, will be understood, unless otherwise indicated) :

| Year. | Gross Earnings. | Operating Expenses and Taxes. | Apparent Net Earnings. |
|-------|-----------------|-------------------------------|------------------------|
| 1906  | $ 26,388.00     | $ 24,384.00                   | $ 2,004.00             |
| 1907  | 41,786.00       | 31,897.00                     | 9,889.00               |
| 1908  | 46,280.00       | 35,593.00                     | 10,687.00              |
| 1909  | 39,708.00       | 36,358.00                     | 3,350.00               |
| 1910  | 38,999.00       | 30,765.00                     | 8,234.00               |
| 1911  | 36,843.00       | 32,058.00                     | 4,785.00               |
| 1912  | 40,898.00       | 32,601.00                     | 8,297.00               |
| 1913  | 43,959.00       | 31,700.00                     | 12,259.00              |
| 1914  | 45,418.00       | 32,454.00                     | 12,964.00              |
| 1915  | 52,501.00       | 33,141.00                     | 19,360.00              |
| 1916  | 60,592.00       | 34,082.00                     | 26,510.00              |
| 1917  | 68,691.00       | 42,758.00                     | 25,933.00              |
| 1918  | 70,876.00       | 50,381.00                     | 20,495.00              |
| 1919  | 85,391.00       | 69,922.00                     | 15,469.00              |
| 1920  | 112,043.00      | 89,623.00                     | 22,420.00              |
| 1921  | 115,422.29      | 112,301.35                    | 3,120.94               |

The most significant disclosure in the foregoing table is that, while the gross earnings in 1921 exceeded those in 1920 by $3,379.29, or about 3 per cent., the operating expenses and taxes advanced $22,678.35, or 25 per cent., and the net earnings of 1921 were less than 14 per cent., or one-seventh, of the net earnings of 1920. In studying these figures it must be remembered that in the year 1920 prices were at their peak. The tabulation of prices prepared by the United States Department of Labor shows that in 1920 the index of prices for all commodities ranged from 179 to 247, and in 1921 from 140 to 170. Furthermore, the company's taxes in 1921 were but $5,753.85, as against $6,831.34 in 1920, a reduction of $1,077.49. Under these conditions it was not unreasonable to expect that the usual and ordinary expense of operating the plant would be little, if any, higher in 1921

than in 1920, and it was rather startling to learn that, while the gross earnings were increased but 3 per cent., the operating expenses grew 25 per cent., or 28 per cent., if taxes are eliminated from the comparison.

The history of the company shows that the average increase in gross earnings prior to 1921 was 15 per cent. In 1915 the increase was $7,083, or 15.6 per cent.; in 1916, $8,091, or 15.4 per cent.; in 1917, $6,059, or 13.3 per cent.; in 1918, $2,185, or 3 per cent.; in 1919, $14,515, or 20.4 per cent.; in 1920, $26,652, or 31 per cent.; and in 1921, $3,379, or 3 per cent. This falling off in revenue, according to Mr. Seaborn, assistant treasurer of the company, is "due to the increased rates charged to the customers." The increased rates were those demanded by the company in its proposed schedule of rates, and subsequently permitted by order of court after being disallowed by the commission.

Evidently conditions influencing gross earnings in 1921 were abnormal. When the commission rendered its decision, it was fair to expect that the company's gross earnings would exceed the revenues of 1920 by about 15 per cent., and amount at least to $126,740.63, the sum assumed by Commissioners Shaughnessy and Simmons, or about 13.1 per cent. in excess of the gross income of 1920. Plaintiff's Exhibit C.

The controlling factors in rate regulation are: (1) The reasonable value of the utility property on which the owner is entitled to a fair return; (2) the gross earnings of the utility out of which operating expenses and taxes must be paid; (3) operating expenses. If, after paying expenses of operation, the remainder is too small to yield a fair return on the value of the property, the only conclusion to be drawn is that the rates are too low or the expenses too high. If the commission or the court allows or approves an extravagant expense account, it must of necessity approve a correspondingly high scale of rates; otherwise, the owner of the utility will not receive a return on the value of his property satisfactory to him.

Commissions are frequently asked to provide or authorize a higher scale of rates, and courts petitioned to declare certain rates confiscatory. Obviously our system of regulating rates offers no temptation to utility owners to keep down the expense account. The statute under which the Nevada commission was organized was passed March 28, 1919. With this in mind examine the above table copied from Plaintiff's Exhibits C and I. In 1919, the year the commission was created, the operating expense account increased from $50,381 to $69,922, an advance of $19,541, or more than 38.7 per cent., while gross earnings increased but $14,515, or 20.4 per cent. During the 13 years before the commission came into existence—i. e., from 1906 to 1919— operating expenses increased $25,997, or 106 per cent., while gross earnings increased $44,488, or 168 per cent. During the 3 years 1919, 1920, and 1921, operating expenses increased $61,920, or 121 per cent., and gross earnings increased but $44,546, or 62.6 per cent. Thus, prior to the act of 1919, gross earnings grew faster than expenses. Since that time the relative growth of the expense account has been extraordinary.

[12] To be allowable in a rate case, operating expenses must be reasonable. The utility should be permitted to earn the cost of operation and a fair return; but, in addition to a fair return, it is not entitled to earn whatever it may choose to spend. Its expense account is limited to the reasonable cost of efficient ordinary operation, to the exclusion of expenditures too large, or otherwise improper, unjust, or unfair to its patrons, who must pay them, if provided for by higher rates.

[13] The cost of enlarging and improving the plant is investment, and should be fairly included in the reasonable value of the utility, on which the owner is entitled to a fair return; but every item thereof ought to be strictly excluded from the operating expense account. The itemized statement of operating expenses for the first eight months of 1921 has been very helpful, but is not so full of detail as to quantities, prices, etc., as to enable the court to determine with confidence what is and what is not proper for consideration in deciding whether the gas rates imposed by the commission are confiscatory. It contains many items such as these: "Materials for supplies, $110.47." "Generator house, pay roll labor, $373.12." For all the information in the statement, the charges might as well have been $25 or $750.

The index of wholesale prices compiled by the Department of Labor shows a falling off in the price of fuel and lighting since September, 1921. During the first eight months of that year the company consumed about 10,810 barrels of gas oil and generator oil, for which it paid $30,957.26, or an average price of $2.86 per barrel. Until June, 1921, $2.9567 per barrel was the price paid by the company. During that month the price was reduced to $2.72, and in July and August it was $2.70. The price dropped in September to $2.47, where it has since remained. Plaintiff's Exhibits E to E–8. Therefore I conclude that between April 1, 1921, and March 31, 1922, the company paid at least $2,340.41 more than it would have paid for oil, if the price had been but $2.47.

The high prices of 1921 cannot be regarded as controlling for the future, in the face of evidence that they have fallen. Furthermore, the undisputed testimony of Mr. Wentworth is that the installation of the new Jones generator will effect a considerable economy in the amount of oil consumed, and an annual saving of $3,000 or $4,000 net, with oil at $2.70 per barrel. $1,683.97 of uncollectible accounts, ranging from $181.73 in March to $231.73 in June, are charged as operating expenses for the first eight months of 1921. For the months of April, May, June, July, and August, 1921, these items aggregate $1,099.20. What they actually were during the 12 months commencing April 1, 1921, is not disclosed, but $2,525 may be taken as a fairly probable estimate.

[14] Bad debts cannot be considered in determining whether rates are confiscatory, except upon satisfactory evidence that the company was in no wise at fault. Mr. Seaborn testifies that it is the custom of the company "to require a deposit equal to the estimated two months bill of the customer." This being the custom or the rule, in the absence of any explanation as to why these bills were not collect-

ed, the only conclusion is that bad debts were due to negligence on the part of the company. The item cannot be allowed.

[15] $8,594.95 is charged as the expense of rate hearings. As such litigation is of rare occurrence, if allowed at all, it should be spread over a series of years; but even this treatment has not been approved by the courts. Such items are deemed to be abnormal, and are not entitled to consideration in determining whether rates are confiscatory. Gas Co. v. Newton (D. C.) 269 Fed. 277, 290; City of Winona v. Wisconsin-Minnesota L. & P. Co. (D. C.) 276 Fed. 996, 1005; Kings County Lighting Co. v. Lewis, 110 Misc. Rep. 204, 180 N. Y. Supp. 570, 586, 591.

[16] I note charges in the first eight months of 1921 for picnics, photographs of employees, rodeo stock, charitable organizations, magazines and newspapers, floral pieces, and music. Such expenditures, especially charitable contributions, are certainly to be commended, but in a suit of this character they should not be imposed on the rate payers, unless in some way it be shown that they were incurred in the service of and for the benefit of the patrons of the company.

Contrasting operating expenses in January, May, and August, 1920, with similar expenses in the same months of 1921, it seems that the company paid in 1920 $609, and in 1921 $738, for superintendence, an increase of 21 per cent.; in 1920 the company paid $831, and in 1921 $1,082.93, for generator house labor, an increase of 30 per cent.; in 1920 $534.24 and in 1921 $665.25, for salaries of officers, an increase of 24 per cent.; in 1920 $801.05, and in 1921 $970.46, for accounting and collection service, an increase of 21 per cent.; in 1920 $568.88, and in 1921 $627.82, for service of clerks, an increase of 13 per cent.; in 1920 $8,821.68, and in 1921 $12,460.91, for generator oil and gas oil, an increase of 41 per cent. In 1920 $128.87, and in 1921 $148.48, for office rent, an increase of 15 per cent.; in 1920 $112.36, and in 1921 $195.40 for insurance, an increase of 73 per cent.

Finding, as I must, that the revenues of the company for the year commencing April 1, 1921, are unusually low, and the operating expenses abnormally high, it is unfair to use them, as presented, in determining whether the rates prescribed by the commission are confiscatory. In the Knoxville Water Case, 212 U. S. 15, 29 Sup. Ct. 152, 53 L. Ed. 371, Justice Moody says:

"We think it was error to confine the investigation to, and base the judgment upon, that year alone. The precise subject of inquiry was: What would be the effect of the ordinance in the future? The operations of the preceding fiscal year, or of any other past fiscal year, were valueless if the year was abnormal, and were only of significance so far as they foretold the future."

It was held in Kings County Lighting Co. v. Lewis, 110 Misc. Rep. 204, 180 N. Y. Supp. 571, 572, that:

"Rates fixed by law for a public utility are not necessarily 'confiscatory,' because for an abnormal year its income is thereby reduced below what would ordinarily be deemed an adequate return on the investment."

The Supreme Court in Darnell v. Edwards, 244 U. S. 564, 569, 37 Sup. Ct. 701, 61 L. Ed. 1317, a railroad rate case, dismissing the bill without prejudice, held that:

"Rates should not be held too low upon evidence that they proved un-remunerative during a brief period, when conditions for traffic were abnormally poor and little effort was made to improve them."

In 1920 gross earnings were $112,043, an increase of $26,682, or 31 per cent., over the previous year. Operating expenses and taxes amounted to $89,623, and were $19,701, or 28 per cent., higher than in 1919. The net income was $22,420. Plaintiff's Exhibit C. Unfortunately details of the expense account for this year also are meager and fragmentary. Plaintiff's Exhibit H shows that in the year 1920 uncollectible accounts were also charged to operating expense, with no satisfactory explanation. As the statement covers but three months of 1920, to wit, January, May, and August, the total amount for the year can only be estimated; but in view of the uniformity of the charge for each of the three months in 1920 and the first eight months of 1921, as disclosed in Plaintiff's Exhibit H and Defendant's Exhibit 22, it is safe to assume a total of $2,148 for bad debts in 1920. Considering the fact that taxes were $1,077 less in 1921 than in 1920, and that 1920 was the year of highest prices, I shall deduct $2,148 from the operating expenses of that year, thus making the net earnings for 1920 $24,568, instead of $22,420, as shown in Plaintiff's Exhibit C.

It appears that more than $30,000 of improvements and additions were made to the plant in 1921. Deducting this amount from $342,470, the value which has been allowed for the plant as of September 1, 1921, the value of the plant during the year 1920 may be estimated as $312,470; deducting $4,600, depreciation annuity, from $24,568, the balance, $19,968, will afford a return of about 6⅓ per cent. on $312,-470. Returning to the valuation, revenue, and expenses of 1921, it will be assumed that the gross income would have been $126,740.63, if the normal increase in business had been maintained during that year. Subtracting from $112,301.35 operating expenses and taxes (Plaintiff's Exhibit I), $8,594.95 cost of rate hearings, $2,340.41 for bad debts, $2,525 difference in the cost of generator oil and gas oil, and $200 contributions for charity, newspapers, etc., the balance, $98,-541.26, may be taken as something in excess of operating expenses and taxes which should be considered in determining whether the rates are confiscatory. Subtracting $98,541.26 from $126,740.63, the assumed gross income, and deducting $4,600 for depreciation annuity, the balance, $23,598.74, will afford a return of 6.89 per cent. on $342,-470.

[17] The burden is clearly on the plaintiff company in this, its attack on the rates fixed by the commission, to show that, if enforced, the difference between the gross revenue derived from such rates and the necessary ordinary expense of operation is too small to yield a fair return on the reasonable value of its property, after paying taxes and a proper depreciation annuity. In other words, it is as much the duty of the company to establish or show necessary cost of operation as to prove the reasonable value of its property.

Rates must be fair to the company, and in any event fair to the consumer and to the public; but rates cannot be fair to the consumer which are based on an excessive allowance for operating expenses.

A return of 6.897 per cent., approximately 7 per cent., falls short of the 8 per cent. return considered by the commission to be just; but the difference is too small, and the conclusions drawn from studying the revenues and expenses of an abnormal year too speculative and unstable, to serve as the basis for a decree nullifying the order of the Public Service Commission of Nevada, and pronouncing the rates established therein confiscatory. The difference between 7 per cent. and 8 per cent. may disappear with slight changes in the more important estimates, which of necessity have been made in the foregoing opinion.

The bill will be dismissed, but without prejudice, and a further order disposing of the money impounded in the Farmers' & Merchants' National Bank of Reno, if deemed necessary and proper, will be entered.